NATIONAL CYPRESS POLE & PILING COMPANY v. HEMPHILL LUMBER COMPANY, Appellant.—31 S. W. (2d) 1059.

Division Two, July 3, 1930.

808

*Orville Zimmerman* for appellant.

*Glenn N. Venrick* and *Langdon R. Jones* for respondent.

812

WHITE, J.—Plaintiff filed this suit April 24, 1924, in the Circuit Court of Dunklin County, alleging that the defendant, January 27, 1920, conveyed to it 1381.13 acres of land in Dunklin County, by a general warranty deed containing the covenants implied in the words grant, bargain and sell, and the specific warranties that the grantor had an indefeasible estate in fee to the premises, had a good right to convey the same, and would warrant and defend the title to the grantee, its successors and assigns, against the lawful claims of all persons whomsoever. The deed is set out *in haec verba*.

The petition alleged that the defendant did not have title to the land and that such title was at all times in the United States; that the plaintiff paid for the land $13,811.30 in cash; that the reasonable market value of the land conveyed was the amount paid; that plaintiff was never put in possession, and that the land was wild and uncultivated.

The petition then alleged that at the time of the delivery of the warranty deed one D. A. Parker claimed title to and ownership of a portion of said lands (described), consisting of 521.41 acres,

and the defendant had brought suit against said Parker to determine title to said portion; that the said suit was tried and it was adjudged that the Hemphill Lumber Company had no title to the land there in controversy; that the plaintiff, defendant here, appealed from the said judgment, which was affirmed by the Supreme Court, and the opinion reported in 300 Mo. 569; 254 S. W. 698. The plaintiff specifically pleaded the record in that case as an adjudication determining that the defendant in this case had no title to the land involved in the Parker suit, and consequently no title in the remainder of the land for the same reason. Judgment was prayed for the full amount of the purchase price and interest at six per cent from the date of payment, and further interest on certain payments it had made as taxes on the land for different years.

The defendant filed answer admitting the execution of the deed conveying the land described in the petition, and denying each and every other allegation in the petition contained.

The defendant further answering said that plaintiff bought all the land in question for the timber that was on it, and was given possession of the land at the time the deed was delivered; had cut and removed from said land a great part of said timber; that there had been no failure of title, no eviction of the plaintiff and no assertion of paramount title. The answer then asked an accounting from the plaintiff for the timber cut and removed.

The answer also alleged that since the decision in the case of Hemphill Lumber Company against Parker, defendant had acquired title, and that by virtue of its deed that title inured to the benefit of plaintiff.

The plaintiff filed for reply a general denial and allegations to the effect that it had removed its operations from Dunklin County, and an after-acquired title would be of no benefit to it; that it tendered in court a quit-claim deed conveying to defendant all its rights in said land; that it was precluded from cutting timber by reason of adverse claims of others.

The case was sent on change of venue to the Circuit Court of Iron County, where it was tried. The court there held that the land was bought by the acre at ten dollars an acre, and rendered judgment for the plaintiff for the amount sued for except as to the purchase price of 62.85 acres, the title to which, the court held, passed by the deed to the plaintiff, judgment being for the full purchase price for the remainder at the rate of ten dollars an acre, amounting to $13,182.80, with interest from the date of the deed. Defendant appealed.

On motion of the plaintiff the court struck out that part of the defendant's answer asking for an accounting for the timber taken off by plaintiff.

Dunklin County extends south as a sort of peninsula into Arkansas, the west boundary of the county being the St. Francois River marking the line between Missouri and Arkansas. A plat introduced in evidence shows a government meander line as the east line of the river, and almost coinciding with that line is Levee No. 4, extending along the east bank of the St. Francois River. To the west of this in the river were Indian Hill Island and Gum Island. Beyond these islands was the main current of the St. Francois River. Between those islands and what is called the mainland on the Missouri side were at one time bodies of water. That between the Indian Hill Island and the mainland was called Indian Hill Slough, and that between Gum Island and the mainland was called Gum Slough. The space in these sloughs varied in width from a quarter of a mile to one mile. When that part of the county was originally surveyed by the United States Government they were bodies of water which gradually filled up, became a swamp and later part of the time mostly dry land. It grew up in timber.

The plaintiff introduced evidence to show that the land in the islands and on the mainland adjacent this tract was surveyed by the Government in 1849; that the swamp land between the islands and the mainland was omitted from the Government Survey.

The plaintiff introduced the Act of Congress of September 28, 1850, called the Swamp Land Act. It was claimed by the plaintiff and admitted by the defendant that the land in dispute was swamp land, covered by the Act of 1850, whereby such land was granted to the several states in which it was located.

Plaintiff introduced a patent from the State of Missouri to Dunklin County of certain lands described which the plaintiff claimed did not include the land in dispute here. Also the records of Dunklin County, showing that about 1100 acres of land in that county had been formed by recession of waters known as Gum Slough and Indian Hill Slough; that the County Court in 1906 ordered that V. V. Randall, a competent surveyor, survey the land. The plat of his survey was put in evidence.

The plaintiff then offered an abstract of title to a number of tracts of land and further surveys covering parts of the land under consideration.

It is claimed by the plaintiff that the lands so surveyed by the county were not included in any tracts surveyed by the Government on Indian Hill Island, Gum Island, or on the mainland; that the State of Missouri in its grant to Dunklin County described land not included in this suit, that it received and in turn conveyed to Dunklin County only areas which had been surveyed by the Government. The plaintiff introduced a number of deeds and patents made by the county to the different persons granting land border-

ing on the sloughs and offered evidence to show that the land in dispute in the sloughs was conveyed by mesne conveyance to the defendant from Dunklin County, while all the land adjacent the portions surveyed by the county was conveyed to other persons, and none of it came to the defendant.

The plaintiff states the condition of this land and its operations as follows:

"The record shows that in about the year 1849, the Secretary of the Department of the Interior, under the Swamp Land Grant, caused to be surveyed and platted certain swamp and overflowed lands adjacent to the St. Francois River in Dunklin County, Missouri. No other survey of the townships included in that survey was ever made by the government under the Swamp Land Grant. This survey covered and included a small tract of land east of and adjacent to the St. Francois River designated as 'Gum Slough Island' (sometimes referred to as 'Gum Island'), and another small tract of land east of and adjacent to the St. Francois River and immediately south of Gum Island, designated as 'Indian Hill Island', and a comparatively large tract of land lying east of Gum Island and Indian Hill Island, herein referred to as 'the mainland.' The mainland was separated from the islands by a strip of swamp land varying in width from about one-quarter mile to one mile. This strip of swamp land was omitted from the Government Survey, and is called and referred to as 'Gum Slough' and 'Indian Hill Slough.' It is in this unsurveyed strip of land that the lands involved in this action principally lie."

Plaintiff introduced some plats on the record in Dunklin County, certified by the Department of the Interior from the land office at Washington. These plats are scarcely legible and add nothing to our information regarding the condition of the land.

The facts in relation to the possession and occupancy of the land will be noted below.

I. It is first claimed that at the time of the execution of the deed from the defendant to the plaintiff the defendant was not in possession of the land described in its deed and did not put the plaintiff in possession.

Mr. Lasswell, former holder in the chain of title, and a witness for the defendant, testified that he and one J. B. Blackmore bought the land in 1910. He afterwards bought out Blackmore. He said: "I kept a man on this property until about 1918." Witness had no interest in the land at the time of the trial except that he warranted the title to the Hemphill Lumber Company.

Mr. S. E. Wright, treasurer of the defendant company, testified that when he bought the land he went over it in person in dry weather when he could go over it.

Mr. Hemphill, president of the defendant company, testified: "After we bought these lands I had our man look after it; go over the land and see that no timber was being taken off. We had men hired for that purpose and in addition we paid taxes on the land from the time we owned it until 1920."

These facts were not disputed. It was admitted that none of the land was in cultivation, and no houses on it in 1920.

After the land was conveyed to the plaintiff the testimony shows certain possessory acts. One J. D. Grady, a witness for the plaintiff, testified that he worked on this land for the National Cypress people. He had known the land for fifteen years; there were no houses on the land and no land in cultivation in January, 1920. He made piling out of the cypress timber found in the slough. He said his work was just cutting timber and helping load it. He said: "I think that was last year." (The case was tried in 1924.) He said further: "I also floated timber for the piling company and got this timber from Cypress Point." He was working for the National Cypress Pole & Piling Company. He said: "I have seen the National Pole & Piling Company cutting piling on the land. And I have seen other operations going on." He said he worked for Mr. Jim Jones and under Mr. Richardson. Mr. Jim Jones was the superintendent of the National Cypress Pole & Piling Company. He said: "The last work being something like two years ago. At times this land was perfectly dry and could be used for pasture." Two years before would be 1922. Witness further said he worked there two summers for Jim Jones.

Mr. Hansen, president of the plaintiff, testified that his company had paid taxes on the land for the years 1920-1921; that he placed no buildings on the land, nor fences. He said: "All the company did was to employ men to go out and cut timber on the land and remove it." He said further on re-cross-examination: "We bought this land for the timber and we started cutting the timber. We cut several thousand sticks of various lengths. I have a record of the number of thousand we cut. We cut 7,470 pieces of piling of various lengths and sizes, and that excludes 18,622 lineal feet of piling, which was cut and which we were not able to remove from the land. We got about three hundred ties off of this land, and we got in the vicinity of 20,000 logs. I don't know the kind of material these logs were, but our operations were all during the years 1921, 1922 and 1923. I can't recall if we did any work in 1924. *We were never stopped from cutting timber by any legal action.* We got in the vicinity of $2,000 worth of material from this land. I can't give you the sale price of this

timber. By value I mean the value of the timber as it stood on the ground in the stumpage, and I arrive at this value by figuring the lineal feet. I couldn't tell you the net profit on the timber.''

It is claimed throughout by the plaintiff that the land in dispute was swamp land, not susceptible of cultivation. It was wild land. It was bought for the timber and the only use made of the land was cutting timber.

Plaintiff cites a number of cases in regard to what constitutes possession. All of those cases, so far as we have been able to find, are where possession is claimed to ripen into title by virtue of the Statute of Limitations. Adverse possession which will cause the Statute of Limitations to run must be open, notorious and continuous, giving notice to any adverse claimant and to the world of the possessor's claim. In such cases the mere cutting of timber on land is held not to constitute such continuous adverse possession as would cause the Statute of Limitations to run. Yet, such acts are acts of possession, though not continuous and notorious so as to start and keep running the Statute of Limitations. Upon the theory of respondent the land was not susceptible of possession at all; the defendant not only had no possession, but could not possibly give possession, and plaintiff bought with that understanding.

We think wild land may be possessed. One is in possession of such land when he exercises dominion and control over it. Absolute control is possession. Such control does not have to be continuous nor for any length of time. [Williams v. Buchanan, 35 Am. Dec. 760, l. c. 762; New Jersey & N. C. Land & Lumber Co. et al. v. Gardner-Lacy Lumber Co. et al., 178 Fed. 772, l. c. 778; Simpson v. Blount, 14 N. C. 46, l. c. 49; Clark v. Kirkland, 119 N. Y. Supp. 1117, l. c. 1118.]

In the Federal Court case wild land was involved. The court said: ''What constitutes possession of land is a mixed question of law and fact.'' And then said: ''Possession [of land] is denoted by the exercise of acts of dominion over the property in making the ordinary use and taking the ordinary profits of which it is susceptible in its present state—such acts to be so repeated as to show that they are done in the character of owner, and not as an occasional trespasser.''

In Simpson v. Blount, supra, l. c. 49, the court said: ''The argument is, that though swamp, the land is susceptible of draining and cultivation; and nothing short of that should be taken to be a possession, when, from the nature of the subject, that can be done. I think the rule is, that exercising that dominion over the thing, and taking that use and profit, which it is capable of yielding *in its present state*, is a possession.'' (Italics in the original.)

In the Williams case, 35 Am. Dec. 762, the statement of the Federal case was quoted almost exactly. It was held that keeping

of fish traps on the land over a sluice every year during fishing season "did constitute unequivocal possession thereof."

The conveyance was made to this plaintiff in January, 1920. Mr. Hansen, president of the defendant, testified that his operations were all during the years 1921, 1922 and 1923. Plaintiff brought this suit in 1924. It therefore exercised all the control and dominion over this property of which it was susceptible in its then state. The land was bought for the timber and immediately after the purchase the plaintiff commenced cutting and removing timber and continued it during a period of three years. That was possession.

A fence, building or other improvement is not necessary to constitute even adverse possession. As stated by this court in Leeper v. Baker, 68 Mo. l. c. 407: "Acts of ownership, under a claim of right, visible, are sufficient to authorize the court to find such possession; and the *nature of these acts of ownership must depend on the uses of which the land was capable.*" (Italics ours.)

In 49 Corpus Juris, page 1094, we find this definition of possession: "Possession of land has been defined as the actual control by physical occupation, and the holding and exercise of dominion over it; the immediate and exclusive dominion over it; that position or relations which gives to one its use and control and excludes all others from like use or control."

Thus it appears that there may be different modes of acquiring and holding possession of land and what constitutes possession in a given instance is sometimes difficult to determine, owing to the existence of qualifying circumstances.

II. Plaintiff claims, however, that its possession was prevented, or at least interrupted, by the claim of D. A. Parker. One of the plaintiff's witnesses mentioned above testified that "some of the timber was cut and left in the woods because there was a fence around there built by Mr. Parker and he threatened to have me arrested. *I told him I had cut the fence* and he told me to leave the timber alone. . . . *He did not forbid me taking timber* and I cut some of the timber, and some we cut was taken out."

The witness did not give the date of that interruption. As noted above, Mr. Hansen testified that "we were never stopped from cutting timber by any legal action." The barbed wire fence which Parker built there, as testified to by the witness Grady, "was built about 1921" after the plaintiff was exercising acts of ownership and control over the land. It does not appear from this evidence that this claim of Parker, or his fence, interfered with the possession of the plaintiff because the plaintiff cut his fence and cut the timber without further protest.

Further, it could not have affected his possession which plaintiff had previously acquired because it did not amount to an ouster. The petition alleges that the title to this land was in the United States Government and the trial court so found. On that theory Parker could have had no interest whatever in the land. He was a trespasser according to the allegations of the petition and the evidence.

We find nothing in the record which prevents the conclusion that the plaintiff was put in possession of the land, and his possession was not disturbed by any legal proceeding nor by any assertion of right to possession by anyone having a better title. The plaintiff bought the land for the timber, apparently cut timber on it as long as it was profitable and then abandoned the land and chose to sue on the covenants of warranty. Under such circumstances the plaintiff could recover only nominal damages.

The plaintiff's reply alleged that any after-acquired title, as claimed by defendant, would do plaintiff no good because it had "removed its operations from Dunklin County." The only "operations" in that county shown by the evidence was *on this land. That was possession.*

III. In order to prove that the defendant had no title to convey to plaintiff, the plaintiff introduced in evidence patents from the county, and chains of title running down to present owners of the land bordering on the land involved in this suit.

Parker was the owner of Gum Island, and it seems, claimed title to the land in Gum Slough by accretion. It is possible other riparian owners claimed parts of the land in dispute by accretion. The petition alleges that title to the land was in the United States Government, and all evidence as to such claims of title was incompetent. The plaintiff was not in position to show title in the riparian owners, or that Parker had any title or right to interrupt its possession.

IV. In support of the claim of want of title plaintiff pleaded the former suit between the Hemphill Lumber Company and D. A. Parker, where it was adjudged that the plaintiff had no title. The case was appealed to this court and is reported in 254 S. W. 698, and 300 Mo. 568. The pleadings in the case and the judgment in the Circuit Court of Cape Girardeau County were introduced in evidence and admitted over the objection of the defendant. The judgment is as follows:

"The decree of the court is that plaintiff has no right, title or interest in or to the lands, claimed by it, in its petition, and to

which claim of title is made by defendant in his answer, and the court further finds and decrees it has no authority to pass upon the title set up and claimed by the defendant in his answer to the lands therein described; for 'the reason that parties necessary to determine such title are not before the court in this action."

Thus the court declined to pass upon what title Parker had because the parties necessary to determine such title were not before the court, so that judgment fails to show any title in Parker; nor is there anything in the record to show that Parker had any right which would prevent the absolute control and occupancy of the land by the plaintiff.'

The plaintiff pleaded the judgment in the Parker case as *res adjudicata*, as finally determining that the defendant in this case had no title. Parker is not a party to this suit. In order that a judgment may be conclusive and *res adjudicata* it must be between the same parties or their privies. The defendant is estopped only as to Parker. [34 C. J. 973-975.] A stranger to a judgment cannot avail himself thereof by a plea of *res adjudicata*. [Henry v. Woods, 77 Mo. 277; Egger v. Egger, 225 Mo. 1. c. 147; State ex rel. Subway Co. v. St. Louis, 145 Mo. 1. c. 567.]

The defendant and the plaintiff as its successor might establish title as against any other person. The court refused to adjudge that Parker had title. The judgment was therefore inadmissible for the purpose of showing that Parker had a right to interrupt plaintiff's possession. No one else claiming title to this land could avail himself of the Parker judgment to show that the Hemphill Lumber Company had no title, and that company was not estopped by that judgment to show that it had title as against anybody else. The judgment was not pleaded, nor offered in evidence for the purpose of showing title in Parker, because the plaintiff's right is based upon an averment of title in the United States. Under the pleadings it was not admissible for any purpose.

There was evidence of the existence of a barbed wire fence, but nothing shown as to what it enclosed, if anything. It was there, somewhere, and the plaintiff cut it. It did not prevent the plaintiff from retaining possession already acquired, for evidence was introduced by the plaintiff to show that it was sued by Parker for cutting timber on the land, which suit was pending at the time of the trial in this case. The bringing of that suit and its pendency tended to prove that the plaintiff here was in control when it cut timber on the land. There is nothing to indicate that the plaintiff would be injured by that suit. Plaintiff is estopped by its pleading to assert that Parker had any right to maintain such a suit, or that the defendant Hemphill Lumber Company was in any way responsible for that action of Parker,

or that Parker's trespass was in any way a violation of the covenants in defendant's deed. Defendant covenanted to defend against *lawful* claims.

Even if plaintiff had pleaded title in Parker and proved it, it would affect only 521.41 acres. It could not affect the remainder of the land. Plaintiff's possession of the remainder was not interrupted, nor was plaintiff annoyed by any adverse claim of title.

V. While it is not necessary for us to determine whether or not the title to the land was in the United States Government as alleged in the plaintiff's petition, it may not be amiss to say that it is doubtful whether the plaintiff made proof that such was the condition of the title. It is admitted as contended that the land was swamp land, as contemplated in the Swamp Land Grant of the United States in 1850, by which such land was granted to the several states in which it lay. Upon the facts asserted by the plaintiff the land in dispute was covered by that grant. It has been held that the title in that case passed by virtue of the grant *proprio vigore* to the State, and it remained only for the Secretary of the Interior to cause the survey and make a selection of those lands. It is held in some cases that title does not vest in the State until such selection is made. When the lands are conveyed by the State and the identification occurs later the passing of the title relates back to the date of the Act, September 28, 1850. [Cramer et al. v. Keller et al., 98 Mo. 279; Simpson v. Stoddard County, 173 Mo. 421, 1. c. 443-4.]

This court said in the Simpson case: "This act of Congress (the Act of 1850), was a legislative grant and required no formal conveyance to transfer the title to all of these swamp lands to the several states. It was, as has been repeatedly ruled, a grant *in praesenti*, the selection ordered to be made by the Secretary of the Interior being merely for the purpose of subsequently identifying the land. . . ."

Then under the pleadings in this case the defendant acquired an equitable title to the land and passed that on to the plaintiff. The plaintiff, however, says that the State while conveying to Dunklin County certain of these lands, did not describe the particular land in dispute except that 62 acres which the trial court held was conveyed by the deed from defendant to plaintiff. By the Act of 1865 the Missouri Legislature granted all such lands to the several counties in which they were located, and title passed by such grant in the same way that title passed from the Government to the State by the force of the Act. [Secs. 6992, 6993, R. S. 1919; Laws 1868, p. 69.]

822

VI. The trial court held by declaration of law given that the cutting of timber on the land and patrolling of such wild and uncultivated land by persons claiming title thereto and under color of title is not sufficient to constitute actual possession. In that the trial court was in error.

The defendant attempted to show title by offering in evidence a letter from the Secretary of the Interior, dated November 17, 1902, for the purpose of showing that the United States Government made no claim to this land. The plaintiff's brief also set out at length a letter from the Secretary of the Interior dated February 8, 1928. The latter, of course, we cannot consider because it was a statement of that office after the trial of this case. We can consider only the case that was tried in the circuit court. On another trial of the case the parties may be able to show just the status of this land with reference to the Federal Government or others.

Under the circumstances, conceding that the defendant failed to show that title was conveyed to the plaintiff by the deed, the covenants of which are sued on here, nevertheless, under the facts shown, the plaintiff was entitled only to nominal damages. The plaintiff's title was not questioned by any stranger to the deed; no one asserted the title or the right to possession except Parker to a portion of the land, and the court held that Parker had no title.

The plaintiff was not disturbed in its possession because it continued to cut timber on the land during the three years it held it, notwithstanding Parker's asserted right.

The judgment is reversed and the cause remanded. All concur.