VARNEY RIVER DRAINAGE DISTRICT, a Corporation, v. F. W. SPIEDEL and BERTHA SPIEDEL, Appellants.—152 S. W. (2d) 54.

Court en Banc, June 10, 1941.

*W. G. Bray* and *McKay & McKay* for appellants.

*Langdon R. Jones* for respondent.

HYDE, C.—This suit, which is a consolidation of two separate causes, is to collect delinquent drainage assessments on defendants' land. Plaintiff had judgment and defendants have appealed.

Defendants' contention is that the assessments against this land are absolutely void, because beyond the constitutional power of the State to make, and that to enforce them would deprive them of their property without due process of law in violation of the Fourteenth Amendment of the United States Constitution. The basis of this contention is that the legal title to the land was in the United States at the time of the organizing of the Drainage District and the making of these assessments, relying upon Lee v. Osceola & Little River Road Improvement District No. 1, 268 U. S. 643, 45 Sup. Ct. 620, 69 L. Ed. 1133.

The land in question was described in patents from the United States to the State of Missouri issued in 1933, after a government survey of Township 18, Range 8 East, of Dunklin County, approved on May 5, 1930. It was agreed that, after the approval of this survey "hearings were held by H. Sam Jones, Special Commissioner, for the Department of the Interior of the United States, to determine whether or not these lands, included in the new survey of township 18, . . . were in fact swamp and overflowed lands in 1850 at the time of the United States Congressional grant (43 U. S. C. A., 982-984) granting to the States the swamp lands lying within the boundaries and limits of such states for reclamation purposes;" and that, after these hearings, "it was finally adjudged and ruled by the Department of the Interior of the United States Government that these lands, including the lands involved in these tax suits and belonging to Spiedel, were in fact at the time of the passage of the congressional grant in 1850, swamp and overflowed lands and that ruling became final." After these patents were issued to this State, it issued its patents to

Dunklin County, in 1934, describing this land. However, it was also agreed that "prior to the petition being filed for the organization of Varney River Drainage District, that Dunklin County purported to survey and plat the lands involved in these tax suits and such purported plat was filed in the office of the Clerk of the County Court of Dunklin County, Missouri, and that subsequent thereto Dunklin County issued its patents for these lands and that F. W. Spiedel is the holder of the title that came down through that chain of title starting with the patents from Dunklin County." Plaintiff District was organized by a decree of the Circuit Court of Dunklin County in 1916, including this land. (Then patented by the county.) The decree finally approving assessment of benefits and damages was entered in 1919. This suit is to collect assessments for the years 1927 to 1934 inclusive.

The Lee case involved lake land owned absolutely by the United States, and not swamp land included in the Act of Congress of 1850. [43 U. S. C. A., 982-984.]. It is settled, as stated in the Lee case, supra, that "the property of the United States is exempt by the Constitution from taxation under the authority of a State so long as title remains in the United States." As also stated therein, this rule has no application "to general taxes assessed (on land sold by the government) after the United States has parted with its title." However, it was held in the Lee case that special assessment taxes could not be levied against land, sold by the government, even after the title had been conveyed by its patent, "where the tax is sought to be imposed for benefits accruing to the property from improvements made while it was still owned by the United States." The reason for this ruling was stated by the court, as follows:

"The United States will be hindered in the disposal of lands upon which local improvements have been made, if taxes may thereafter be assessed against the purchasers for the benefits resulting from such improvements. Such a liability for the future assessments of taxes would create a serious incumbrance upon the lands, and its subsequent enforcement would accomplish indirectly the collection of a tax against the United States which could not be directly imposed. . . . (And quoting from another case) If the grantee of the United States must take the land burdened with the liability (of assessments to an improvement district) . . . made to include it without the assent of the government or the purchaser, it attaches a condition to the disposal of the property of the government without its sanction or consent, . . . which must, in such cases, interfere with its disposal."

Clearly the situation here is different because there can be no question in this case of interfering with or hindering the disposal of this property by the United States government. This is true because it has been finally determined that this was swamp within the Act

of Congress, approved September 28, 1850, which provided that "the whole of the swamp and overflowed lands, made unfit thereby for cultivation and remaining unsold on or after the 28th day of September, A.D. 1850, and granted and belong to the several States respectively, in which said lands are situated." [R. S. Sec. 2479; 43 U. S. C. A., 982, other Sections of Act, R. S., 2480-81; 43 U. S. C. A., 983-984.]

Concerning the effect of the Act of 1850, the United States Supreme Court, in United States v. State of Minnesota, 270 U. S. 181, 46 Sup. Ct. 298, 70 L. Ed. 539, said:

"The first section was in the usual terms of a grant *in praesenti*, its words being that the lands described 'shall be, and the same are hereby, granted.' The second section charged the Secretary of the Interior with the duty of making out and transmitting to the Governor of the State accurate lists and plats of the lands described, and of causing patents to issue at the Governor's request, and it then declared that on the issue of the patent the fee simple to the lands should vest in the State. The third section directed that, in making out the lists and plats, all legal subdivisions the greater part of which was wet and unfit for cultivation should be included, but where the greater part was not of that character the whole should be excluded. The question soon arose whether, in view of the terms of the first and second sections, the grant was *in praesenti* and took effect on the date of the act, or rested in promise until the issue of the patent and took effect then. The then Secretary of the Interior, Mr. Stuart, concluded that the grant was *in praesenti* in the sense that the State became immediately invested with an inchoate title which would become perfect, as of the date of the act, when the land was identified and the patent issued. [1 Lester's Land Laws, 549.] That conclusion was accepted by his successors, was approved by the Attorney General (9 Op. Atty. Gen. 253), was adopted by the courts of last resort in the states affected, and was sustained by this court in many cases." (Citing cases.) [For later cases see United States v. O'Donnell, 303 U. S. 501, 58 Sup. Ct. 708, 82 L. Ed. 980.]

In the Minnesota case, the court held that an attempted disposal of such swamp lands by the United States, even under its treaty powers, to the Chippewa Indians, "before the title under the grant was confirmed by the issue of patents," did not "divest the state of her rights in the lands." Quoting from United States v. Louisiana, 127 U. S. 182, 8 Sup. Ct. 1047, 32 L. Ed. 66, the court said that "Under the Act of 1850, the swamp lands are to be conveyed to the state as an absolute gift." Likewise, in Work v. Louisiana, 269 U. S. 250, 46 Sup. Ct. 92, 70 L. Ed. 259, it was held that patents to perfect the State's title under the 1850 grant could not be withheld on the ground that the swamp lands involved were also mineral lands, reserved by the United States under a later determined policy. There-

fore, if the land herein involved was in fact swamp land in 1850, then the United States had already disposed of it (prior to the organization of plaintiff district) by granting it as a gift to the State of Missouri; and was bound upon its identification as such swamp land to perfect the title of this State thereto by issuing patents to it. The character of this land as such swamp land has now been finally decided, so it is clear that the United States has had no interest therein for its disposal since 1850; and that any disposal it might have made, other than by patent to the State of Missouri, would have been in violation of the rights of this State, because this congressional Act has remained in force and is still in effect.

Pursuant to this congressional grant our Legislature provided that all such swamp lands, "which were granted to the State of Missouri," by the Act of 1850, "are hereby donated to the counties in which they may be respectively situated, and shall be the absolute property of such counties for the purposes hereinafter designated." [Sec. 11128, R. S. 1929, 7 Mo. Stat. Ann. 4874.] For original enactments see Laws 1850-51, p. 238; Laws 1852-53, p. 108; Laws 1854-55, pp. 154, 160; Laws 1857, p. 32; Laws 1868, p. 68; Laws 1869, p. 66. Article 5 of Chapter 66, R. S. 1929 (secs. 11128-11164, 7. Mo. Stat. Ann., 4873-4888), contains full provisions for sale of such swamp land by the counties, and the use or investment of the funds derived from such sales; and makes it the duty of the Secretary of State (sec. 11152), "to act as swamp land agent, to locate such public lands" and "to obtain the right of the state under said acts." Section 9747, R. S. 1929 (12 Mo. Stat. Ann., 7868) provides that "swamp lands and lots shall become taxable whenever the county sells, conveys or agrees to convey its title." The taxability of such interest has been upheld in Millerson v. Doherty Land & Cattle Co. (Mo.), 241 S. W. 907. In General American Life Ins. Co. v. Dunklin County, 339 Mo. 289, 96 S. W. (2d) 380, this court held that (under United States Supreme Court decisions discussed) it was settled that the Congressional Act of 1850 vested in this State a beneficial interest *in praesenti* in swamp lands which interest ripened into a fee simple title relating back as of the date of the act, when such lands were properly identified; that our own statutes effectively passed the State's beneficial interest to each county, so that when the State's title was perfected and was patented to the County by the State (as required by the provisions of Art. 5) the county's title was likewise perfected as of the date of the grant; and that a conveyance by the county to a purchaser, before the title of the county and State had been perfected by proper identification of the lands and patent by the United States, "transferred this inchoate or equitable title of said county" and "operated as a transfer of the rights of said respective grantors (including subsequent grantors of the title conveyed by the county) in and to said subsequently perfected fee simple title, issuing upon

said inchoate or equitable title, to said respective grantees as of the date of the respective investiture in said grantees."

Thus we have held that a beneficial, inchoate or equitable title to such land can be conveyed by a county, prior to the proper identification and patent of swamp lands by the United States to the State of Missouri, and from the State to the county, which carries with it all rights to the subsequently perfected legal title. [See also 50 C. J. 1006, sec. 273, and cases cited.] In fact, the only title defendants have comes from that source. Under the circumstances of this case, should they be heard to question it? Our conclusion is that the grantee of a county has an interest properly subject to taxation, as provided by Section 9747, and we see no good reason why such interest should not be likewise held liable to special assessments levied for improvements authorized and made after the grantee has obtained his patent from the county. Of course, such a tax (as is the grantee's title) is dependent upon the actual *status* of the land as swamp land in 1850. If the land was not swamp land in 1850, then the county patent would be void, and so would all taxes and assessments; but if it was swamp land in 1850, then the United States has never since that time actually had any rights which could have been in any way affected by the county patent or by taxation. It had then disposed of its entire interest and was thereafter bound to issue its patent to perfect the title, whenever the actual *status* of the land was determined. The United States had the right to have this determination made (through the Secretary of the Interior) before it was obliged to issue a patent, and it has done so in this case. Therefore, the legal title has been perfected as of the date of the original grant and this is sufficient by its relation back to that date, to validate these drainage proceedings herein involved.

We think this conclusion is in harmony with the ruling of the United States Supreme Court in Exchange Trust Co. v. Drainage Dist. No. 7, Poinsett County, Ark., 278 U. S. 421, 49 Sup. Ct. 181. In that case, an injunction against collection of drainage assessments was sought on the contention that they were void on the same ground as herein claimed, and likewise upon the authority of Lee v. Osceola & Little River Road Improvement Dist. No. 1, 268 U. S. 643, 45 Sup. Ct. 620, 69 L. Ed. 1133. In the Exchange Trust case, as in the Lee case, the land was not swamp land going to the State under the congressional grant, but was owned absolutely by the United States. The facts were that "nearly all lands embraced in the annexation (of 1918) to the district, including the land of appellant, belonged to the United States at the time the original district was organized in 1917, but prior to June 23, 1919, Rice (to whose rights appellant succeeded) and practically all other homesteaders of the United States received their final certificates of entry or their patents on the land involved;" that plans for improvement and the first assessment affect-

ing the lands in controversy were filed on May 24, 1919; that "neither the plans nor the assessments were approved until June 23, 1919;" and that "the first bonds issued affecting the lands here involved were issued August 1, 1919." The Court refused an injunction, saying that "by June 1919, Rice and practically all other landowners who petitioned for the annexation, had received final certificates of entry from the United States;" and that "by those certificates they acquired the equitable title to the land and that became subject to taxation and assessment, even though the legal title remained in the United States." The United States Supreme Court has also said, in considering the validity of taxes assessed against a perpetual lessee, that "the value of property consists in its use, and he who owns the use forever, though it be on condition subsequent, is the true owner of the property for the time being." [Perry & Co. v. Norfolk, 220 U. S. 472, 31 Sup. Ct. 465, 55 L. Ed. 548.] Here the only condition, upon which defendants' title could have failed, existing at the time the assessments sued for herein were levied, has been finally determined in their favor; and their right to use the land under their equitable title is now merged in the legal title.

Thus we find nothing in the opinions of the United States Supreme Court which would be contrary to the conclusions (hereinabove stated):

First: That the grant in the Congressional Act of 1850 gave the State of Missouri sufficient beneficial interest in all swamp lands so that, under its legislative donation thereof to its counties, a patent from a county (even before the *status* of the land as swamp land in 1850 had finally been determined by the officers of the United States charged with that duty) could convey an existing right in land, which actually was swamp land in 1850, that would carry with it the legal title when this *status* was settled by subsequent determination.

Second, that such a county patent to such land gave the grantee therein sufficient beneficial interest or equitable title, so that such land became subject to taxation and assessment to pay for improvements made under authority of State law.

We, therefore, hold that these assessments are valid liens upon the land involved.

The judgment is affirmed.

PER CURIAM:—The foregoing opinion by HYDE, C., in Division One is adopted as the opinion of the Court en Banc. All concur.