DRAINAGE DISTRICT NO. 48 OF DUNK-
LIN COUNTY, Missouri, Drainage Dis-
trict No. 25 of Dunklin County, Missouri,
and St. Francis Drainage District of Clay
and Greene Counties, Arkansas, Appel-
lants,

v.

Truman (Pete) SMALL, Pauline Small, Ross
Small and Ora Lee Small,
Respondents.

No. 46867.

Supreme Court of Missouri,
En Banc.

Dec. 8, 1958.

Kirsch, Cathey & Brown, Paragould, Ark., for St. Francis Drainage Dist. in Clay and Greene Counties, Arkansas.

Ford & Ford, Jones & Jones, Kennett, for Drainage Dists. Nos. 25 and 48 of Dunklin County, Missouri.

Web A. Welker, Portageville, Merrill Spitler, New Madrid, for respondents (defendants).

HYDE, Judge.

Action to abate a nuisance, claimed to have been created by a private levee built by defendants, and for injunctive relief against its maintenance. The trial court found for defendants except as to a part of the levee which defendants agreed they had no right to maintain. On appeal, the judgment was affirmed by the Springfield Court of Appeals. Drainage District No. 48 of Dunklin County v. Small, Mo.App., 311 S.W.2d 29. On application of the drainage districts involved we ordered transfer.

The substance of the pleadings is stated in the opinion of the Court of Appeals (311 S.W.2d loc. cit. 30–32) to which we refer. We also refer to and adopt the plat of the area with the explanation thereof set out in the opinion of the Court of Appeals. 311 S.W.2d loc. cit. 33–34. The St. Francis River through this area, and above and below it, is the boundary line between Missouri and Arkansas. Dunklin County, Missouri, is on the east side of the river and Clay and Greene Counties, Arkansas, are on the west. In 1910, the St. Francis Drainage District of Clay and Greene Counties, Arkansas, constructed a levee on the west bank of the river and has maintained it since. Drainage District No. 25 was established by decree of the County Court of Dunklin County, in November, 1911; and a levee was completed in 1914 on the location shown in the plat, with a drainage ditch on the east side. At that time, none of the area involved, now owned by defendants, had been surveyed by the U. S. Government except a small portion (apparently containing less than 30 acres) at the north end, shown on the plat with crossed lines inside the meander line of the original survey, made in 1848. The land involved is all in Township 18, Range 8, east of the 5th principal meridian. Defendants' land involved is in Sections 20, 21, 28, 29, 31 and 32 of that township. In the 1848 survey, the St. Francis River was shown as covering all of this land except the small irregular shaped portion above referred to, which was in Section 21, where Varney River came into the St. Francis from the east. The United States survey of this land now involved was completed in 1930, about 16 years after the District 25 levee was completed.

The parties thus stipulated as to the issues: "That the only issue for determination by the court relative to the above entitled land is, Have plaintiffs acquired flowage rights or easements over the lands in question of the defendants? And if the court determines that such rights have vested in plaintiffs, then the question for the court to further determine is the right of defendants to construct and maintain their private levee."

■ The only information we find in the record as to the location of defendants' land with reference to the boundaries of District 25 is contained in the statements of paragraph 2 of plaintiffs' petition (admitted by defendants) "that Drainage District No. 25 embraced certain lands situate in Dunklin County, Missouri, and lying east of the St. Francis River, and said lands so embraced within the boundaries of Drainage District No. 25 were assessed for benefits, and damages were allowed to other lands for the construction of the levees, ditches and other improvements contemplated by Drainage District No. 25, and among which said improvements was a levee east of the St. Francis River and *west of the lands included within the boundaries of Drainage District No. 25* and a ditch immediately east of said levee". (Emphasis ours throughout.) This seems to mean that the levee was the west boundary of District 25. Defendants so claim and contend for that reason plaintiffs could obtain no prescriptive right of flowage over the land between the levee and river channel, citing Anderson v. Inter-River Drainage & Levee District, 309 Mo. 189, 274 S.W. 448; Sigler v. Inter-River Drainage District, 311 Mo. 175, 279 S.W. 50; Provident Irrigation District v. Cecil, 126 Cal.App.2d 13, 271 P.2d 157. As held in those cases, owners of land outside the district could not prevent or obtain damages for increased flowage caused by construction of the levee, because the existence and powers of the district are referable to the police power of the state; so such flowage uses could not be adverse.

■ Plaintiffs, however, claim that the 1911 decree of the county court establishing District 25 was sufficient under the facts and circumstances of this case to grant it an easement of flowage over the lands between the levee and the river channel, which subsequent purchasers could not obstruct. Plaintiffs point out that the notice given in the organization of District 25, after naming landowners, contained the general recital "to all other persons interested". Defendants say that to impose a flowage easement over the land they now own, it was necessary to make the county a party and this general statement in the notice was not sufficient to do so. Plaintiffs rely on Troeger v. Roberts, 284 Mo. 363, 223 S.W. 796, in which it was sought to enjoin a contractor from going on condemned right-of-way over the plaintiffs' land, claiming the land had not been properly condemned. The plaintiff's contention was that her name was not mentioned in the notice, required by Section 5587, RS 1909. (The statute applicable to the organization of District 25.) It was held that a general statement in the notice ("to all other persons owning lands to be affected, etc.") "was sufficient to give the court jurisdiction over each and every person owning lands within the drainage district". (The plaintiff's land was properly described in the notice.) Defendants' contention, upheld by the court of appeals, was that the notice herein was insufficient because their lands were not located within the district, and the county court was not specifically named in the notice. However, the county court was directly involved in this proceeding, administering and supervising it and constructing the works over swamp land owned by the county, so we do not think the failure to specifically name the county or the county court in the notice is conclusive on the issue of flowage rights over this land.

■ Defendants also say the legal title to land involved was in the United States and that the United States was a necessary party to the District 25 proceedings in order to establish an easement, citing United

States v. State of Alabama, 313 U.S. 274, 61 S.Ct. 1011, 85 L.Ed. 1327; Maricopa County, Arizona v. Valley National Bank, 318, U.S. 357, 63 S.Ct. 587, 87 L.Ed. 834. These cases do not involve unsurveyed swamp land; and, as we pointed out in Varney River Drainage District v. Spiedel, 347 Mo. 1124, 152 S.W.2d 54, 56, the United States Supreme Court has held the grant of swamp land "was in praesenti in the sense that the state became immediately invested with an inchoate title which would become perfect, as of the date of the act, when the land was identified and the patent issued." We therefore, upheld in that case the right of a drainage district to levy its assessments against swamp land conveyed by a county before the status of the land as swamp land in 1850 had finally been determined by the United States. In this case, as in the Spiedel case, the title of defendants was based on such determination, which shows the United States had parted with its title by the 1850 act and had no interest in it. We, therefore, hold that the United States was not a necessary party to the District 25 proceedings.

The final decree of the county court, establishing District 25 in 1911, stated: "We have condemned for a right of way for said main levee and ditch, a space of one hundred fifty feet on the east side of the survey line, and ninety feet on .the west side of the survey line, *and in determining the benefits and damages we did take into consideration the value of the property so appropriated as well as all property between said levee and the channel of the St. Francis .River*, and have also.taken into consideration all property prejudicially affected by the improvement. The right of way for said ditch and levee embankment is condemned only for the purpose of constructing and maintaining said improvement, and said district shall have at all times full right to enter upon said premises for the purpose of constructing and maintaining said improvement.". It was admitted that no benefits or damages were

assessed against these lands west of the levee, but there was surely some purpose for mentioning in the decree this area belonging to the county.

■ The District's ditch and levee were constructed through the area involved herein in Sections 21, 28, 29 and 32 entirely through unsurveyed lands (marked as being in the St. Francis River on the 1848 survey) except for the small irregular shaped tract in Section 21 hereinabove mentioned. The equitable title to these unsurveyed lands (under the Congressional grant to the states by the 1850 swamp act and the legislative donation of Missouri to its counties) was in Dunklin County. See National Cypress Pole & Piling Co. v. Hemphill Lumber Co., 325 Mo. 807, 31 S.W.2d 1059, 1065; Varney River Drainage District v. Spiedel, 347 Mo. 1124, 152 S.W.2d 54. District 25 was organized under Article 4, Chapter 41, RS 1909, Sections 5578–5635,[1] as a county court drainage district. As to such a district, we have said: "Differing from the circuit court law, drainage districts established by the county court remain under the administrative control of that court (not a board of supervisors), and the county treasurer acts as treasurer of the district." State ex rel. Drainage Dist. No. 8 of Pemiscot County v. Duncan, 334 Mo. 733, 68 S.W.2d 679, 681. It was also said in Drainage Dist. No. 23 of New Madrid County v. Hetlage, 231 Mo.App. 355, 102 S.W.2d 702, 708: "The county court, as a court, manages such county court drainage districts in the same manner as it manages the affairs of the county." In State ex rel. Applegate v. Taylor, 224 Mo. 393, 469, 123 S.W. 892, 913, we said: "The drainage district in question is not independent of the county; but, upon the other hand, it owes its being to and is subject to its authority and control in the same sense in which townships of a county are subject to its control. It does not even have the independent government like townships have under the township organization. The county court administers its

---

1. Now V.A.M.S. § 243.010 et seq.

entire affairs, and the county clerk keeps its records."

It is clear from the 1909 statutes above cited and these authorities that Dunklin County through its county court established and operated District 25 and constructed its works. Dunklin County also owned the land in township 18 over which these works were constructed (for which works landowners within the district paid) including all the land between the levee and the river. It is said that the county was not made a party to the District 25 proceedings and therefore the county court had no authority over the land outside the levee, but it would seem that this contention would be equally applicable to the land on which the levee and ditch were constructed, nearly all of which was also unsurveyed swamp land of the county. However, Section 5620, RS 1909, specifically provided authority for considering benefits to swamp land belonging to the county and for payment of part of the costs of works out of proceeds of the sale of swamp lands or by conveyance of such lands to contractors by the county. Furthermore, Section 8028, RS 1909,[2] provided that county courts "shall have full power and control over all such overflowed and swamp lands * * * and to sell and dispose of the same in like manner and with like effect as is or may be provided by law for the conveyance of other real estate belonging to their respective counties." See also Section 7997, RS 1909.[3] The decree states that in determining the benefits and damages the value of all property between the levee and the channel of the St. Francis River was taken into consideration. It is reasonable to believe that no benefits would be assessed against it because this land outside the levee would not be benefited; and that no damages would be fixed because it belonged to the county which was establishing and administering the project (with authority to dispose of this land to pay costs) and because the 1848 survey indicated that the river already ran over it

as it undoubtedly continued to do with any substantial raise. (There was evidence that a raise of two and one-half feet would put water from levee to levee.) It also seems reasonable to believe that every one connected with this project (landowners and county court) would have considered the purpose of leaving such land outside the levee would be to leave a sufficient space for the water coming down the river at higher stages to flow between the Missouri and Arkansas levees and that it would be subject to such servitude. Defendants say this would not be true because this land was not described in the decree. Of course, it could not have been described by Section, Township and Range because it had not been surveyed by the United States and was shown by the only United States survey ever made prior to that time as being in the St. Francis River. Under these circumstances, we think the description was sufficient for such purpose of imposing a flowage easement on this land belonging to the county; and the county court must have had some such purpose in mind when it described this area in its decree as it did.

■ Under these circumstances, we have a situation somewhat similar to common law dedication, or dedication by estoppel. See 16 Am.Jur., Dedication, Sections 5, 8, 13, 16; 26 C.J.S. Dedication §§ 2, 8, 12, 13, 15. The Drainage District was organized and the works constructed by the county over land it owned for the purpose of reclaiming and protecting the land east of the levee. The river had a low water channel with low banks and the Arkansas levee on the west side already caused the river to flow over the land on the Missouri side at any higher stages. Obviously the purpose of the new levee was' to confine this flow to the area between the two levees. (There was evidence that there was water on this land the year around before the levees were built.) This pur-

---

2. Now V.A.M.S. § 241.150.

3. Now V.A.M.S. § 241.160.

pose would appear from the reference to this area in the decree, from the maps and plans of District 25, and from any view of the actual construction and the resulting physical situation. Therefore, the landowners who paid for the levee, from assessments on the basis of the benefits charged against their land, certainly would be justified in believing that this area between the levee and the river' was intended to be used for confining high water flowage as a part of the entire project. In fact, it does not seem that the levee could be of much benefit to the landowners otherwise; and equity should not permit the county to use or sell this land for purposes which would interfere with or endanger these works which it was constructing for them at their expense. Moreover, more than the interest of the landowners of District 25 is involved because drainage and levee districts operate under the police power of the state since their projects are essential to the health, safety and welfare of all; and as hereinafter noted federal funds, appropriated by Congress, have been used to improve these protective works.

Defendants did not buy this land until after it had been used as a flowage area for 30 years, and the deed under which defendants got title recognizes the existence of easements. Their deed from their grantors, dated July 3, 1944, stated: "The land above conveyed subject to all easements for drainage and levee improvements and rights of way." The deed to their grantors, dated February 1, 1944, contained the same recital. It is not shown in this record when or from whom the grantors in the deed of February 1, 1944, obtained title; but it was stipulated that "no county patents to lands of defendants were issued prior to the construction of said Arkansas and No. 25 levees, and that defendants' lands are swamp and overflow lands." It was shown that the survey of the tract including defendants' lands was made in 1930; and defendants say the County Court of Dunklin County patented to their mesne

grantors "the full fee simple title in the said lands, making no reservations or exceptions." However, a county patent cannot make a warranty and its effect is to vest in the grantee all the title of the county in the lands conveyed. Pool v. Brown, 98 Mo. 675, 684, 11 S.W. 743. Plaintiffs rely on the principle stated in Missouri Power & Light Co. v. Thomas, 340 Mo. 1022, 102 S.W.2d 564, 566, as follows: "Where there is a sale of a tract of land upon which there is an obvious existing easement or burden of any kind, like an ordinary highway, a railroad, or millpond the fair presumption, in the absence of any express provision in the contract upon the subject, is that both parties act with direct reference to the apparent existing burden, and that the vendor demands, and the purchaser pays, only the value of the land subject to it. This presumption is independent of the question whether the party enjoying the easement has perfected his title as against the vendor or not. Nothing being said upon the subject, they deal with the property in its existing condition, and upon the assumption that it is subject to all the burdens to which it appears to be subject." See also Foxx v. Thompson, 358 Mo. 610, 216 S.W.2d 87. There are limitations on this rule as stated in Missouri State Oil Co. v. Fuse, 360 Mo. 1022, 232 S.W.2d 501; but a purchaser of real estate is charged with notice of an easement where the existence of the servitude is apparent upon an ordinary inspection of the premises. 17A Am.Jur. 761, Sec. 156; see also 28 C.J.S. Easements §§ 48-49, pp. 711, 712; Annotations 41 A.L.R. 1443, 74 A.L.R. 1250. In this case, it appears not only that the flowage area between the two levees and its purposes as an easement of District 25 were obvious from the physical appearances of the land but also that defendants had notice of it from the exceptions stated in their deed. See 16 Am.Jur. 607-611, Sections 298-304; 26 C.J.S. Deeds §§ 137-140, pp. 993-1028. Under these circumstances, we hold that defendants took title from their grantors subject to an easement of flowage in the area between the levees.

We must, therefore, consider the second question stated in the stipulation of the parties, namely to determine the right of defendants to construct and maintain their private levee.

It is alleged and admitted that Drainage District No. 48 was established in 1951, embracing substantially the same lands as District 25, to comply with the requirements of the United States Government for construction of new levees. (The District extended 13 miles north from the area of defendants' land.) The work to be done was construction of new levees and ditches and the acquisition of an easement in additional lands for flowage between the District 25 levee and the new levee to be constructed east of it by District 48. (These new works were necessary because of new drainage districts above, in Butler and Stoddard Counties, which increased the flow of flood waters.) In Township 18, the additional flowage area condemned was 282.50 acres (see plat, 311 S.W.2d loc. cit. 34) and similar works were provided on the Arkansas side of the river. This was all part of an over-all flood control project for the St. Francis River, pursuant to an act of Congress, for about 15 counties in Missouri and Arkansas. (The evidence showed that over the years high water had caused a number of breaks in the old District 25 levee.) The new District 48 levee has been completed, and, in accordance with the new flood control plan, sections of the old levee of District 25 were removed so that river waters could spill over onto the lands acquired between the old and the new levees for an additional flowage area. Defendants built the private levee around their lands between the river channel and the old levee of District 25 (see plat, 311 S.W.2d loc. cit. 34) connecting on the north and south with this old levee, so as to use it as a levee to protect their lands on the east side, filling the parts removed by District 48 pursuant to the new flood control plan. The evidence shows defendants' work has removed about 1,000 acres of flowage between the Missouri and Arkansas levees and has restricted the flowage area there to 576 acres. The distance between the Missouri and Arkansas levees was about 6,000 feet through the center of defendant's land, but it is only 766 feet between the Arkansas levee and defendants' private levee at the same point.

Defendants' land involved was unimproved timber land, no part being in cultivation. Defendants had been cutting timber from this land for about 12 years, often floating it out. In February, 1955, after defendants had proposed construction of a private levee, plaintiffs' attorney wrote them that such construction would be opposed. In June, 1955, defendant, Pete Small, wrote the county court for permission to cross the ditches and levees of Districts 25 and 48 with machinery. The court made an order refusing such a permit, which was sent to defendants. Nevertheless, in August, 1955, defendants moved their machinery across these ditches and levees, filling the ditches to do so, and commenced to build a levee around their land, although attorneys for the District wrote them not to begin such construction and stating it would be opposed. It was shown that during a high water stage in February, 1956, the water banked against the District levee, at the north end of defendants' construction, approximately five feet higher than the water south of that point, which broke the levee there and also washed a hole in the main levee of District 48. One of plaintiffs' engineers said the effect of plaintiffs' levee would be to increase the height and velocity of flood water "which could cause scouring and other damage to the levee along which it ran"; that it "could possibly cause the failure of the main line levee of 48"; and that it would cause higher elevation and velocity against the Arkansas levees which "would tend to scour the main levee and spur levee and damage those levees." Another engineer said of the new flood control plan under which the District 48 levee was constructed: "The floodway was made wide enough and the height of the levee was made high enough so that taken together with the restrictive

**504**

action of the Wappapello Dam and passing water from the steep upland area that the water could be carried in the floodway without overtopping the levees." He also said that defendants' levee would raise the flood height and increase its velocity and that "if you got the maximun flood or the type of flood that we are working with, I think there would be very great likelihood that the water would go over the top of the levee and would cause it to crevasse and be destroyed." He further stated that higher velocity of the water "would either scour a deep hole into the borrow pit and thereby damage your foundation or you will scour the body of the levee itself"; and "therefore it would be more costly to maintain."

Although defendants contend plaintiffs showed no more than a mere possibility that the construction of their private levee might damage plaintiffs' levees, we think plaintiffs' evidence was substantial evidence to show that damage would result and maintenance costs increase and so hold. See statement on this matter in the opinion of the Court of Appeals, 311 S.W.2d loc. cit. 35. Of course, defendants had no right whatever on any theory to attach their levee to the District 25 levee and interfere with the new flood control plan of District 48 by filling the. parts of the District 25 levee which had been removed to permit use of the new flowage area provided between the two levees. If defendants had the right to do what they did, other landowners in the area between the Missouri and Arkansas levees could build similar levees; and plaintiffs' evidence is certainly sufficient to show that this would make it impossible for the St. Francis flood control plan to be effective. We, therefore, hold that defendants have no right to construct or maintain a private levee around their land between the Missouri and Arkansas levees.

The judgment is reversed and the cause remanded with directions to enter a new judgment in accordance with the views herein expressed.

All concur.