**HALLS LEVEE DISTRICT OF BUCHANAN COUNTY, Missouri, a Corporation, and Lewis H. Sonnenmoser, Albert Kuhnert, Donald Frakes, Clifton Hurst and Frank Bunton, constituting the Board of Supervisors of Halls Levee District of Buchanan County, Missouri, Plaintiffs-Respondents,**

v.

**Frank H. HAUBER and Willie Hauber, husband and wife, and Roy W. Hauber, Defendants-Appellants,**

**John E. Rupp, Julia Rupp, Walter C. Crockett, Forrest Crockett, Joseph F. Slahorek and Elizabeth B. Slahorek, Intervenors.**

No. 25304.

Kansas City Court of Appeals, Missouri.

Oct. 5, 1970.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 7, 1970.

Dan Hale, Strop, Watkins, Roberts & Hale, St. Joseph, for appellants.

Sprague, Wilcox & Houts, St. Joseph, for respondents.

CROSS, Judge.

This is an action for a mandatory injunction brought in two counts by plaintiffs Halls Levee District of Buchanan County and its constituted board of supervisors against defendants Frank H. Hauber and Willie Hauber, husband and wife, and Roy W. Hauber, owners of a 13.01 acre tract of land located within the levee district. In count one plaintiffs prayed that defendants be required to remove a rock dam they had constructed without authority across a drainage ditch right-of-way easement maintained by the levee district as an outlet to New Mud Lake, one of several bodies of water within the district. In count two of their petition plaintiffs prayed damages arising by reason of legal and engineering expenses incurred. Defendants filed a motion to dismiss, an answer, and a cross-petition against three individual members of the board of supervisors alleging unlawful expenditures of the district's moneys and praying recovery thereof on behalf of themselves and other property owners in the levee district. In addition to the three named original defendants, six owners of property in the vicinity of Old Mud Lake, a body of water lying east and upland of New Mud Lake, intervened and filed answer as defendants,

alleging in substance that their property consisted of lakes and swamplands used for hunting and fishing and that removal of the dam would lower water levels to the detriment of their property interests and purposes.

Defendants' motion to dismiss was denied, and upon trial the circuit court found the issues in favor of plaintiffs and against defendants and defendant intervenors, granted the injunction as prayed, disallowed any recovery of damages by plaintiffs and denied defendants damages under their cross-petition. It was a specific order of the court that "Defendants Frank H. Hauber and Willie Hauber, husband and wife, and Roy W. Hauber, completely remove the rock dam obstruction from and across plaintiffs' drainage ditch right-of-way to the full extent that such rock dam has been placed across said drainage ditch right-of-way; that such removal shall be at the expense of defendants and shall be completed on or before the 19th day of May, 1969, and that said defendants and each of them be restrained from, in the future, maintaining said obstruction across said drainage ditch." Defendants have appealed. No factual issue was developed involving the interests of defendant intervenors and they have not appealed.

Halls Levee District was incorporated in 1948 by decree of the Circuit Court of Buchanan County under authority of statutes presently found in Chapter 245 RS Missouri, 1969. (All statutory references are to RSMo 1969, V.A.M.S., unless otherwise noted). The district is located in Buchanan County, south and west of St. Joseph, and extends for several miles to a point near Rushville. It is bounded on the northwest and west sides by the Missouri River and there surrounded by levees constructed along the edges of the Missouri River. A relatively small portion of the district is involved in the present controversy. The focal matters in dispute center upon New Mud Lake, an outlet drainage ditch leading therefrom over and along an easement held by the district, and two dams successively constructed within the drainage ditch, as later appears.

Following incorporation and organization of the district a "Plan for Reclamation" dated April 21, 1948, was adopted by its board of supervisors to protect lands within the district from the effects of flooding and overflow waters, all as provided by Chapter 245. In 1949 an "Amended Plan of Reclamation" was prepared by E. I. Myers, chief engineer for the district, which was adopted by the district's board of supervisors on the 8th day of September, 1949. In the course of further proceedings relative to the proposed amended plan certain owners of property within the district (including defendant Frank H. Hauber) filed exceptions thereto. The matters of dispute thereby raised were settled by stipulation entered into by the district and the exceptors, the terms of which were incorporated into the final amended plan as approved by the court.

The stipulation was signed by defendant Frank Hauber and recites (1) that he is owner of the 13.01 acre tract presently involved; (2) that the district agrees to construct at a specified place, and according to specifications set out in the amended plan, an overflow spillway (dam) across a drainage ditch located on Hauber's land as an outlet from New Mud Lake, it being the stated purpose of the dam to maintain the water level in New Mud Lake as far as feasible at 790' above sea level; (3) that "an easement is hereby granted to the Halls Levee District" for a strip of land 80' wide along and over the 13.01 acre Hauber tract on which "the district shall have the right to construct, re-construct and maintain" the drainage ditch previously mentioned; and (4) that the compensation to be paid Frank Hauber therefor is $100.00.

Some time in 1952 following execution of the stipulation the district constructed, in accordance with the terms of that agreement and as specified by the engineer in the amended plan, a metal dam across the

drainage ditch. It was located adjacent to and alongside the east side of Ebling Bridge which spanned the drainage ditch as a part of a public highway. The life of the metal dam was relatively short. Some time between 1954 and 1958 it was removed either by or at the direction of defendants Frank H. Hauber and Roy Hauber, without the district's authorization. One witness, a former member of the board of supervisors, testified that at Frank Hauber's request he cut holes in the metal sheets of the dam with a welding torch after Mr. Hauber said that he wanted to pull them out. Another witness for plaintiff saw Frank and Roy Hauber present when the sheet metal of the original dam was being pulled out by means of a dragline and a bulldozer. Walter Andrews, who was chairman of the board of supervisors at the time the metal dam was removed, testified that the board did not approve its removal and that such proposition was never put before the board. Defendant Roy Hauber (the only original defendant who testified) admitted that he attempted to remove the steel dam in 1958 with a bulldozer and a cable attached to the holes that had been burned in the metal. He stated the cable cut through the metal and that his efforts were unsuccessful. He testified that the steel dam was subsequently removed, but that "I do not know who taken it out". He denied that either he or his father had done so.

It appears that the property owners of the district generally adjusted to the conditions resulting from the removal of the metal dam and the lowering of the water level on New Mud Lake. Some acres that had formerly been devoted to recreational purposes were converted to agricultural uses by the expenditure of substantial sums. Insofar as the evidence shows, the situation so remained until midyear of 1966, at which time, as disclosed by official records of the district, the Haubers sought and were refused permission by the board of supervisors to rebuild the dam they had torn out. It is evident from Plaintiffs'

Exhibit 7, minutes of a meeting of the board of supervisors for the district on June 28, 1966, that Roy Hauber appeared personally before the board at that meeting and requested authority to rebuild the original metal dam the district had erected and that the Haubers had removed. Relative thereto the minutes specifically state:

"After reading the minutes of the previous meeting which were approved as read, the first order of business was to request Mr. Landis (the district's attorney) to explain to the Board and to Mr. Hauber and Mr. McCarty what the District's rights were with regard to any obstruction or construction placed or erected within the Drainage System of the Halls Levee. Mr. Landis advised that Mr. Hauber could rebuild the structure at his own expense that was placed there several years ago and that he tore out, and that the Board could give him permission to construct a crossing *but that he could not construct it without the Board's approval.* He also stated that if putting even that first Spillway back in would cause anybody's crops to flood for 1966, he oughtn't to do that for this year.

"With regard to the matter, Mr. Louis Sonnenmoser made a resolution, which was seconded by Mr. Albert Kuhnert, to the effect that no decision could be made at the present time, and recommended that the Board consult with Mr. E. I. Myers, Engineer, Kansas City, Mo., at the first opportunity to determine what effect the restoration of a 790 ft. water level would have on other farm land above the bridge on New Mud Lake Drain. Mr. Sonnenmoser stated he believed that this level of water would have a very serious effect on growing crops in the vicinity of the drainage area, inasmuch as conditions have changed since that agreement was made, and that further study should be made of it before making any definite decision. This resolution was voted on and passed unanimously." (Emphasis supplied.)

Roy Hauber ignored the board's formal refusal of his request to build the dam. He freely admits that following the meeting of June 28, 1966, and after hearing Mr. Landis' "advice to the Board of Supervisors" he constructed a rock dam across the drainage ditch which served as an outlet to New Mud Lake. Thereafter, as shown by the minutes of a meeting on August 17, 1966, obviously in an effort to secure removal of the dam Hauber had built, the board took official action as follows:

"* * * A motion was made by Mr. Sonnenmoser, seconded by Mr. Kuhnert that Mr. Roy Hauler be ordered to remove the obstruction placed in the ditch, within thirty days, which motion was voted on and carried unanimously."

In support of that action, the board again expressed its disapproval of any change in the area drainage by way of any dam or structure whatsoever except in conformance with an "amended drainage plan" then in preparation by Mr. Myers, its district engineer. This was done by the following quoted resolution duly adopted at the same meeting on August 18, 1966, as shown by the minutes:

"It is the feeling of the Board that we have a moral obligation to improve the drainage in the area and we are having the District Engineer, Earl I. Myers to draw up an amended plan, and this question of the reestablishment of a water level and any spillway or structure of such nature should be done only with his supervision and in conjunction with the Amended Drainage Plan."

The rock dam constructed by Roy Hauber was not placed at the Ebling Bridge location where the former steel dam was erected. It was placed about thirty feet east and upland from Ebling Bridge, or approximately thirty feet closer to the lake bed than the steel dam had been. The physical characteristics of the rock dam are markedly different from the original metal dam. As its designation indicates, the rock dam consists merely of a mass of rock hauled in and bulldozed across the ditch as a "rock fill". That undertaking, according to Roy Hauber, was accomplished in one day. It was built to a higher elevation than the original metal dam. At its lowest point the rock dam measures 790.1 feet above sea level, whereas the metal dam elevation was specified to be 789.3 feet. Simple calculation reveals that the rock dam elevation is at least .8 feet (9 inches plus) higher than that of the former dam. The rock dam is "broad crested", i. e. wide at the top; the steel dam was "sharp crested" and "very narrow on top." The rock dam is in the shape of a V, with sides ascending toward the ends. The steel dam was level across the top. The rock dam had a greater tendency to catch brush, weeds and debris of all kind than the narrow crested steel dam. It is convincingly shown by the evidence that the rock dam was not an efficient agency of drainage, that it created "a backing up" of water above it and that it had a "slower run off" than the original metal dam which had been constructed according to engineering specification, and which "in contrast to it would let the water go over it evenly and quickly."

The rock dam has created generally higher water levels in areas east of it in the vicinity of New Mud Lake, and has rendered some upland farm lands unfit for crop purposes. Walter Andrews, whose land bounds New Mud Lake, testified that the new rock dam "holds water on part of my land, and the other portion of it holds water so close to the top that I can't raise a crop". The acreage so affected was stated by engineer Myers to be eight to ten acres. He further stated that the rock dam caused the water level on Mr. Andrews' land to run up to 791 or 792 feet. Likewise, William Row, whose property also abuts New Mud Lake, lost the use of "eight or ten acres we haven't been able to farm on account of this type dam that is put in."

On the other hand, the Haubers have received substantial benefit from the rock

dam. By its placement thirty feet nearer the lake, they "drained" and thereby reclaimed several acres that had previously been part of the lake bed—thirteen acres according to Mr. Andrews and Mr. Myers. Roy Hauber claimed he drained only seven acres. Whatever acreage he drained was salvaged for farming use. He accomplished this by installing "a tube running under a levee protecting his field, draining his field, and the water comes out between the rock dam and the original dam which gives him drainage from this field." The Haubers received additional advantage and profit from the rock dam. Roy Hauber testified that since it was constructed and "with the lake", he is able to lease it out to duck hunters in the fall. That revenue amounts to "probably $200.00 a year beside the good that I get out of it, and maybe my family and friends that I want to take down there."

Testifying as chief engineer for the district, Mr. Myers expressed the opinion that the only solution to the drainage problem involved was to reestablish a lower water level for New Mud Lake than the 790 feet provided for the in the stipulation. He explained that the 790 feet figure was adopted as a compromise because "the only way we could settle the exceptions" (referring to those filed against the amended plan in 1952) was by adopting the 790 feet elevation therein agreed upon. He stated that "the 790 has been demonstrated as being too high" and recommended that the allowable water level in New Mud Lake should be lowered approximately eighteen inches —that is, from the stipulated 790 feet to an elevation of 788.50 feet. During the course of preparing a new amended plan for improving drainage in the district, as the board of supervisors had directed him to do, Mr. Myers submitted a progress report dated September 18, 1968. He recommended therein that "pending a final so-lution of this matter", necessary action should be taken by the board of supervisors without delay to obtain "court permission" to lower the authorized New Mud Lake level from elevation 790.00 feet to 788.50 feet sea level and to accomplish that result by reducing the elevation of the rock dam.

This suit was filed on December 9, 1968. The board of supervisors took that action pursuant to a resolution adopted at a meeting attended by four of the five supervisors constituting the board's membership, namely, Messrs. Kuhnert, Frakes, Sonnenmoser and Hurst. Supervisor Frank Bunton was absent. Messrs. Kuhnert, Frakes and Sonnenmoser voted in favor of the resolution to institute this present action. Mr. Hurst abstained from voting.

■ Defendants first contend the court erred in refusing to dismiss the cause "because the three members of the board that authorized this suit were not acting as the majority of a duly elected board." Arguing the matter, defendants say only that the minutes do not reflect that the three supervisors were duly elected in accordance with statutory procedures set out in Chapter 245, but cite no pertinent authority. We reject the suggested ground of error. It is the well established rule that title to public offices of the nature here involved may not be questioned collaterally as defendants have attempted to do. Under the facts in this case any attack upon the validity of the supervisors' election or their tenure as officers, must be determined by a proceeding in quo warranto.[1] The case of Fort Osage Drainage Dist v. Jackson County, Mo., 275 S.W.2d 326, is directly in point. There, as do defendants in the instant case, the defendant county (sued for taxes assessed against it) undertook to make a collateral attack upon the validity of acts done by the district's board

---

1. It is provided by Section 245.065 that if ouster be sought on the ground that a meeting of landowners for the election of supervisors was improperly called or that notice thereof was defective, a proceeding to vacate such office may be entertained in the circuit court. Since that ground of complaint is not asserted in this case, the remedy provided in Section 245.065 would not have been available.

of supervisors, asserting that they had not been legally elected. Affirming judgment for the drainage district, the Supreme Court held that the acts of the board in levying the tax and instituting the suit were the acts of de facto officers, the validity of which could not be questioned in the manner defendant had attempted. Also see Boggess v. Pence, Mo., 321 S.W.2d 667, where the Supreme Court, en banc, reaffirms that "the title to a public office or the right of a de facto officer to exercise the rights and duties of the office can not be tested except by the state in a direct proceeding for that purpose. (Citing numerous cases.)"

■ Defendants additionally suggest they were entitled to a dismissal for the reason "plaintiffs would have a clear remedy at law to lower the water level on New Mud Lake by following the statutes". The statutes referred to are sections of Chapter 245, which define the powers and duties of the supervisors and spell out in comprehensive detail a complete and relatively complex procedure for "the levying, protection and reclamation of the land and other property within the district" by preparing, adopting and executing a "Plan of Reclamation." The suggested procedure is the same the district utilized in effecting the presently existing "amended plan of reclamation", a result which took some four years to accomplish. In order to secure the relief now sought by plaintiff, it is not necessary to repeat that prolonged and expensive experience. The district is not attempting by this action to secure a lowering of water level at New Mud Lake, per se, or to amend its existing reclamation plan in any sense. It asks only that defendants be required to remove the rock dam they have illegally placed across the district's drainage ditch easement and refrain from replacing it. It is well established that in order to withhold injunction on the ground that there is an adequate remedy at law, the legal remedy must be certain and reasonably prompt and as practical and efficient to the ends of justice as

an injunction would be. 42 Am.Jur.2d, Injunctions, Section 40, p. 779. The legal remedy suggested by plaintiffs does not conform to those standards and we decline to withhold injunction on the ground that procedure under Chapter 245 would afford plaintiffs adequate relief.

■ Defendants' second point charges the trial court erred in requiring them to remove the rock dam because that would be contrary to plaintiffs' amended plan of reclamation and contrary to the recommendation of their engineer. The record does not justify our interference with the trial court's action for the foregoing suggested reasons. The amended plan does not call for a dam built to the specification of the one defendants placed across the drainage ditch, or of the material used in constructing it. Nor does the amended plan call for any dam at all at the particular location where defendants built the rock structure. The only dam specified was the steel dam erected at Ebling Bridge, which the defendants saw fit to destroy. Defendants' argument that plaintiffs' engineer Myers did not favor removal of the dam is predicated on his answer to the trial court's question, "Do you know of any solution other than to take out the rock dam and put the metal one back in?" The witness answered, "No, that would not be my recommendation." Our understanding of the quoted answer is that the engineer did not recommend replacement of the metal dam.

■ Defendants' third point is a complaint that "the court erred in finding that any legal entity had any rights of drainage across the land owned by the three Haubers." The point is meaningless because defendants have not pointed to anything in the record to show that the trial court had found that any "legal entity" had drainage rights over the Hauber land. However, from our own standpoint as a court reviewing the facts de novo, it is apparent to us that under the amended plan of reclamation, as modified by the 1952 stipulation, the plaintiff levee district is still in legal posses-

sion of the right-of-way easement thereby granted over and along defendants' land for drainage purposes.

Defendants' fourth point is in two parts, in the first of which they urge that the decree is erroneous because: "It is based upon findings of fact contrary to the positive written evidence introduced in the case to-wit, the minutes of the meetings of the board of supervisors." In argument defendants refer to the minutes of only two meetings—those held on June 28, 1966, and on November 29, 1966. The minutes of the June 28, 1966, meeting were introduced in evidence as Exhibit 7 and relevant portions are quoted hereinabove. It is clearly evident therefrom that the board did not grant Roy Hauber authority to build a dam—even to specifications of the original metal one at Ebling Bridge. The minutes of the meeting of November 29, 1966, were not introduced in evidence, but defendants' witness Gaskill read a single paragraph therefrom as follows: "Mr. Gaskill stated that Frank and Roy Hauber had requested permission to build a dam, and it was agreed that unless they would give the District an easement for a by-pass, the only place the dam could be erected was down by the bridge." Witness Gaskill then undertook to testify to statements, dehors the minutes, made by persons present at the meeting, but the trial court declined to consider such testimony. Such action by the court was proper, since the minutes themselves would constitute the only admissible evidence of the board's action. State ex rel. Compton Company v. Walter, Mo., 23 S.W.2d 167. We rule that the decree is consistent with and not contrary to the minutes of board meetings that were introduced in evidence.

Finally, defendants challenge the right of plaintiff district to maintain this action. They submit that the levee district brought the suit to enforce private rights of resident landowners, that the suit "has nothing to do with enforcing the rights of the levee district" and that there is no evidence in the case to establish that the district is en-

titled to any relief. We cannot accept those views.

The plaintiff levee district is a public corporation and a political subdivision of the state, created under authority of Section 245.015, "for the purpose of having such land and other property reclaimed and protected from the effects of overflow and other water, for sanitary or agricultural purposes, or from the effect of wash or bank erosion, or when the same may be conducive to the public health, convenience or welfare, or of public utility or benefit, by levee, or otherwise * * *". Those functions are expressly delegated to plaintiff district as a specific grant of the state's police power. As stated in Drainage District No. 48 of Dunklin County v. Small, Mo., 318 S.W.2d 497, "drainage and levee districts operate under the police power of the state since their projects are essential to the health, safety and welfare of all."

Even defendants admit, in their brief, that "The Levee District is a creature of statute and a public body and its officers are public officers to carry out the public good." Thus it is seen that plaintiff levee district has been constituted by law as the master agency to act for and on behalf of all persons within its boundaries in matters pertaining to flood control, reclamation of lands, and protection from harmful effects of water. Those functions having been delegated to the district, their performance must be left to that constituted authority. It is inconceivable that the individual landowner has the right to plan and act separately, according to his individual idea or fancy, as defendants have done twice in the history of Halls Levee District. Chaos would result if property owners were at liberty to experiment with and innovate engineering projects separate from those lawfully adopted by the district and incorporated in its plan of reclamation. Recognizing that fact, our legislature has wisely enacted statutes prohibiting certain of those acts and declared them to be crimes punishable by law. Section 246.210 pro-

vides in pertinent part that it is unlawful for any person "to fill up, or cause to be filled up, injure, impair or destroy the usefulness of any drain, levee, ditch, dike, revetment, or other works" constructed in any lawfully organized drainage or levee district, or "to build any fence, dam, or other works across any such ditch." Violation of those provisions constitutes a misdemeanor punishable by fine or imprisonment or both. With greater severity, Section 246.220 provides, "Whoever shall cut, dynamite, or willfully fill up, injure or otherwise impair or cause to be injured or impaired any drainage ditch constructed by any drainage or levee district organized under any law of this state shall be deemed guilty of a felony, and upon conviction thereof shall be imprisoned in the state penitentiary for a term of not less than two nor more than fifteen years."

■ In disregard both of civil authority and criminal statutes, defendants have "filled up" and obstructed the subject drainage ditch by building a dam across it —to the detriment of the district's reclamation plan and the interests of other property owners. From the record before us it is manifest that defendants are guilty of a "legal wrong" against the property rights of plaintiff district and the public it represents. There being no adequate legal remedy thereagainst, the remedy of injunction is afforded by Section 526.030 V.A.M.S. and is available to plaintiff levee district. It is fundamental that the comprehensive grant of statutory powers to levee districts, drainage districts, road districts, school districts and like governmental agencies of the state, includes by necessary implication, the right to institute and prosecute appropriate actions to effectuate those powers.[1]

It is our conclusion that plaintiff district, acting through its supervisors, is legally entitled to maintain this action in order to carry out and protect its reclamation plan. In doing so it is "exercising exclusively governmental functions; the private benefits accruing to the individual landowners being purely incidental." State ex rel. Caldwell v. Little River Drainage Dist., 291 Mo. 72, 236 S.W. 15. Also See D'Arcourt v. Little River Drainage District, 212 Mo.App. 610, 245 S.W. 394 and cases cited. We further find and conclude that plaintiff district is entitled to injunctive relief in all respects as decreed by the trial court except for the time limit set for removal of the dam, to-wit: May 19, 1969 —obviously an expired date. We amend the judgment by striking the phrase "on or before the 19th day of May, 1969" and substitute therefor the word "forthwith".

As amended, the judgment is affirmed.

All concur.

---

1. To illustrate: In Thompson et al. (Supervisors of Drainage District No. 33) v. City of Malden, Mo.App., 118 S.W.2d 1059, the court held that the drainage district was entitled to injunction restraining defendant city's illegal use of a drainage ditch of the district. In Drainage District No. 48 of Dunklin County v. Small, Mo. (en banc), 318 S.W. 2d 497, plaintiff district was held entitled to enjoin landowners from maintaining a private levee around their lands. The court there said: "If defendants had the right to do what they did, other landowners in the area, * * could build similar levees; and plaintiffs' evidence is certainly sufficient to show that this would make it impossible for the * * * flood control plan to be effective."