Morris E. OSBURN and Adaline Osburn, his wife; Gary Kyle Williams, Individually and as Executor of the Estate of Eva L. Williams, Deceased; Maxwell P. Casey and Sammy Casey, his wife; D. Gary Spencer and Nita A. Spencer, his wife; Paul E. Sapp and Jessie E. Sapp, his wife, Plaintiffs-Appellants,

v.

SUPREME EXPRESS AND TRANSFER COMPANY, a Missouri Corporation; Harry T. Bussmann, Jr.; and James A. Gresham, Defendants-Respondents.

SUPREME EXPRESS AND TRANSFER COMPANY et al., Defendants-Appellants,

v.

Morris E. OSBURN et al., Plaintiffs-Respondents.

No. KCD 29931.

Missouri Court of Appeals, Western District.

Oct. 1, 1979.

Motion for Rehearing and/or Transfer Denied Oct. 29, 1979.

Application to Transfer Denied Dec. 6, 1979.

Robert L. Hawkins, Jr., Hawkins, Brydon & Swearengen, Jefferson City, for plaintiffs-appellants.

Ronald K. Carpenter, Phillips, McElyea, Walker & Carpenter, Camdenton, for defendants-respondents.

Before SHANGLER, P. J., WASSERSTROM, C. J., and CLARK, J.

SHANGLER, Presiding Judge.

The dispute concerns a promontory of land, known as Cooper's Point, on the main

channel of the Lake of the Ozarks in Morgan County. The plaintiffs own contiguous tracts of land on the Point on which stand their dwelling houses. These tracts are on an eminence high above the water. The defendant Supreme Express and Transfer Company [wholly owned by defendant Bussmann] has a splendid edifice—the Chateau du Lac—on the waterfront.[1] Two ways interlace the Bussmann property, the Upper Road and the Lower Road, and are the only practical means of access to and from the lakefront for the plaintiffs and others on the elevated portion of the Point. The defendant Bussmann installed gates across the Upper Road and the Lower Road, tended by the defendant Gresham—caretaker for the Bussmann property—to prevent pedestrian and vehicular movement to the lakefront, and this litigation ensued.

The petition of the plaintiffs comes in two counts. Count I pleads that the Upper Road is a public road and seeks to enjoin the defendants from interference with that use by the plaintiffs and to enforce removal of the posts and gates installed by the defendants. Count II seeks determination that the plaintiffs own easements by prescription over the Lower Road access to the Lake and over a strip of lakefront used to dock their boats, and seeks also to enforce removal of posts and gates installed across that road by the defendants and to enjoin interference with the use of the easements by the plaintiffs.

The court found for the plaintiffs on Count I and adjudged that a twenty-foot width of the Upper Road was a public roadway, enjoined the defendants from obstruction of the roadway or interference with use by the plaintiffs and ordered the defendants to remove the posts and gates installed within the public way. The court found for the defendants on Count II of the petition. The parties cross-appeal from the judgment adverse to each.

1. The landmarks and other references significant to review are cited on Appendix of the opinion, the depiction of County Surveyor Slagle and received in evidence as an exhibit.

## COUNT I: THE UPPER ROAD

The defendants contend that the judgment on Count I was erroneous because the evidence proved neither a public road established by dedication nor a user and public expenditure under Chapter 228, RSMo 1978. More exactly, the defendants contend that a donation by deed of the Upper Road failed for want of a certain description and that the order of the County Court to open the Upper Road as a public way was not recorded as required by § 228.190.

A public road may be established by prescription, or by dedication, or by the effect of statute. *Gover v. Cleveland*, 299 S.W.2d 239, 241[1–4] (Mo.App. 1957). The judgment on Count I does not say by what principle of law the Upper Road was adjudicated as an established public road, but only that: "the roadway along and upon the twenty feet strip of land hereafter described is a public roadway."

The evidence on Count I, taken most compatibly with the judgment, shows: The present location of the Upper Road dates from about year 1932 when the Union Electric Company impounded the Osage River at the Bagnell Dam to form the Lake of the Ozarks. The lowland road to the Osage River inundated by the Lake waters was relocated on the Point with funds paid to Morgan County by the Union Electric Company. The Upper Road[2] was intended to supplant that access to the waterfront previously available by the lowland road and so was graded to the edge of the Lake for that purpose. Even before the inundation, however, there was a lane roadway along the general contours of the later Upper Road used by the public which traversed the Point to a ferry on the river bank.

The lands on the Point were at that earlier date in the common ownership of Peter Milton Cooper. In September of 1923, Cooper undertook to convey to Morgan County by recorded quitclaim deed

2. The Upper Road has been known also, variously, as County Road Y–13, C. H. Sidebottom Road, Peter Milton Cooper Road or, simply, as Cooper Road.

A strip of land (40) feet wide for a public road across my farm in Section 16, Township 40 North, Range 16 West, of the 5th Principal Meridian, as surveyed and located by the Highway Engineers of Morgan County, Missouri.

The deed by which defendant Supreme Express and Transfer Company [the defendant Bussmann] acquired title to the land on Cooper's Point mentions the conveyance by quitclaim.

■ The defendants contend that the description in the Cooper quitclaim transfer so lacks definiteness as to render location of the roadway impossible. They contend also that the allusion by the deed to a survey by the Highway Engineers of Morgan County cannot be borne out by the records of the County Clerk. We conclude that the deed by Cooper in year 1923, even if sufficient to locate the roadway over his land, did not, without a public acceptance, amount to establishment of a public way. A county court alone has authority to establish a new county road—with or without petition. *Foster v. Dunklin*, 44 Mo. 216, 218 (1869). Thus, to constitute a common law dedication of a county road, there must also be an adoption of that deed by the county court— an action altogether lacking. *Vossen v. Dautel*, 116 Mo. 379, 22 S.W. 734, 735 (1893); *Hayes v. Kansas City*, 294 Mo. 655, 242 S.W. 411, 414 (1922). The quitclaim deed by Cooper—absent acceptance by a proper authority—was without efficacy to invest the Upper Road as a public way.

After the lake flooded the lowland, Cooper in November, 1931, once again conveyed a right-of-way by deed filed with the County Clerk, this time as an incident of a [now] Chapter 228 proceeding to open a public way. The petition to the County Court to locate the public road gave the beginning, course, and terminus of the way, the names of the owners of the lands affected [§ 228.-020], notice to them of the proceedings [§ 228.030], upon which, in the absence of remonstrance [§ 228.040], the County Court directed the county highway engineer to survey the proposed way [§ 228.060] and, upon proof that the right-of-way was se-

cured, the County Court then ordered the road established [§ 228.080]. Thus, the Upper Road was declared a legally-established county road in year 1932. The relinquishment of the right-of-way by Cooper was filed in the County Court of Morgan County as public record [§ 228.090] but not with the Recorder of Deeds of that county as also required by that statute.

The defendants contend that neither they nor their predecessors in title had either the constructive notice of a public road over their lands that a recorded deed imparts, nor actual knowledge of the instrument of relinquishment of that strip to public use, so that the conveyance is invalid as against them.

■ The jurisdiction of a county court to open a public way, once vested, does not lapse merely because other formal requirements of Chapter 228 have been met only imperfectly. *Ripkey v. Binns*, 264 Mo. 505, 175 S.W. 206, 208[4] (1915). The power of a county court to render such an order rests by statute on a petition in due form attended by the names and notice to the persons affected by the placement of the road. *Stutz v. Cameron*, 254 Mo. 340, 162 S.W. 221, 226 (1914); *Bennett v. Hall*, 184 Mo. 407, 83 S.W. 439, 440 (1904). In this case, Cooper and his wife—the only landowners affected—consented to the county action by their deed of donation so there was no question of sufficiency of notice or objection by remonstrance, and since the precise course of the proposed road was plotted by survey, there could be no question of the formal sufficiency of the petition either.

The defendants concede that the failure to record the conveyance of right-of-way as required by § 228.090 was a defect in the statutory proceeding to establish a county road not essential to jurisdiction to adjudicate the subject matter of the petition, and so is cured by a proof compliant with § 228.190:

All roads in this state that have been established by an order of the county court, and have been used as public highways for a period of ten years or more, shall be deemed legally established public

roads; and all roads that have been used as such by the public for ten years continuously, and upon which there shall have been expended public money or labor for such period, shall be deemed legally established roads; and nonuse by the public for five years continuously of any public road shall be deemed an abandonment and vacation of the same.

The defendants contend, however, that there was no proof of public money or labor spent on the Upper Road for ten continuous years for any period from December 31, 1932, the date of the order to establish the road, so the failure to record the conveyance of right-of-way was not meliorated as to them and they are entitled to the land unburdened by that public use.

■ We conclude, however, that the Upper Road was lawfully opened as a public way by—as to the defendants—a regular order and proceeding of the county court under Chapter 228 and that whatever formal defect resulted from the neglect to record the conveyance of right-of-way did not affect the defendants. Accordingly, the plaintiffs had no need for resort to § 228.-190 to perfect the Upper Road as a legally established public way.

We assume for purposes of contention that § 228.090,[3] which directs that a deed or relinquishment of the public road be filed with the recorder of deeds is meant to impart notice of the existence of a public way and that the interests of the defendants, as purchasers of the fee,[4] were not affected by the unrecorded conveyance but come to them as lands wholly private in use.

[1 Elliott on Roads and Streets, § 462, et seq. (4th ed. 1926)]. Notwithstanding, we conclude from the evidence [and conformable with a judgment entered without determinations of fact] that the defendants acquired title with the actual knowledge that the Upper Road was in place over the tract of their intended purchase and was in public use. The defendants were not prejudiced by failure to record the right-of-way.

The acquisition of the Point property by the defendants was no casual matter. It was concluded only after protracted negotiations and a familiarity with the premises. The defendant Bussmann saw the Lake property for the first time in 1956, when he came to know Deem, the owner [and common grantor of the plaintiffs]. He visited the property intermittently, but regularly, until 1962 when he purchased the land after long discussions with owner Deem. From his first view in 1956, the Upper Road across the center of the tract was a defined way, and obviously in use for access to the Lake by the public as well as by the residents of the Point. The continued use by the public of the Upper Road as a means to the waterfront was palpable to Bussmann even after year 1962, when the defendant Supreme Express & Transfer Company took title, and went unchallenged until he installed a gate across that way in 1975. That public use, whatever the precise nature, was perfectly apparent to Bussmann—and the law assumes, fairly, that the parties to a real property transaction acted with direct reference to the servitude which obviously affects the land transacted.

3. The full text of § 228.090 reads:
The county highway engineer shall file all relinquishments, deeds and plats of said road in the office of the county clerk, who shall preserve them together with the order of the court establishing the road as public records in a book to be provided for that purpose. All such deeds shall be filed and recorded in the office of the recorder of deeds.
The section does not say *when* or *by whom* the conveyance shall be recorded with the recorder of deeds but, presumably, allows that to any party in interest. Thus, the option remains open to the plaintiffs to perfect the formal county court proceedings to establish the Upper Road as to future purchasers by the mere recordation of the Cooper conveyance of right-of-way.

4. The deed of conveyance of the fee upon which the Upper and Lower Roads are located recites the defendant Supreme Express and Transfer Company as sole grantee. The defendant Bussmann, concededly, is the alter ego of that corporate grantee, in fact made the purchase and precipitated the litigation by installation of a gate across each road. For the purpose of this litigation the interest of the defendant Supreme Express & Transfer Company and the defendant Bussmann are interchangeable.

*Drainage District No. 48 of Dunklin County v. Small*, 318 S.W.2d 497, 502[6–8] (Mo. banc 1958). Thus, where the servitude appears upon an ordinary inspection of premises, a purchaser of real estate is bound by such knowledge. *Guerin v. Yocum*, 506 S.W.2d 46, 48[5, 6] (Mo.App.1974); 28 C.J.S. Easements §§ 48–49. The defendants had actual knowledge that the land was subject to an easement of public use and took the estate subject to the actual servitude. *Loumar Development Co. v. Redel*, 369 S.W.2d 252, 257[13, 14] (Mo.1963).

As our discussion notes, at acquisition by Supreme Express the Upper Road had been in continuous use as a public way since installation after order of the county court on December 31, 1932. The warranty deed by the Deems to the Supreme Express subjects that grant to a "Right of Way Deed to County for County Road 40 feet wide, as recorded in Book 1, page 201." That conveyance was the early tender of right-of-way by Cooper to Morgan County in 1923— before advent of the Lake of the Ozarks— which failed for want of official acceptance by the county court. That conveyance described the intended donation of right-of-way to the county as "a strip of land (40) feet wide for a public road across my farm in Section 16, Township 40 North, Range 16 West of the 5th Principal Meridian, as surveyed and located by the Highway Engineers of Morgan County, Missouri." The defendants contend that the 1923 conveyance of right-of-way so lacked definiteness as to render impossible the location of the road. They contend further that search by the county clerk found no record of the survey to which this conveyance alludes and so inquiry would have yielded no more conclusive location of a county road over the property than did the description in the warranty deed to Supreme Express from the Deems.

That early tender by Cooper to Morgan County in year 1923 [to which the Deems' deed to Supreme Express alludes], lapsed for want of acceptance by proper authority. Thus, had Bussmann made inquiry for the survey with the county clerk— the repositary by law of records which affect establishment of a public road—they would have learned at once that the strip of land described in the deed from Deems had never been opened as a public road and the property was not subject to that servitude. They would have learned just as promptly, however, that another donation of right-of-way was made by the same grantor—Cooper—to the same grantee—Morgan County—on November 19, 1931, and was sanctioned as a public road by order of the county court on December 31, 1932, and was extant over their lands.

It was sufficiently suggestive to a purchaser with personal knowledge for six years of a public user over a fully-defined roadway across property intended for acquisition, and then accepted by a deed which expressly subjects the fee to a right-of-way for a county road, albeit by mistaken reference, as to constitute actual notice of an existent public use over the property and an implied notice of the servitude in fact established by the county court order which a reasonable inquiry would have disclosed readily. *Drainage District No. 48 of Dunklin County v. Small*, supra, l.c. 502; *Guerin v. Yocum*, supra, l.c. 48; *Loumar Development Co. v. Redel*, supra, l.c. 257.

The defendants took subject to the open and visible public easement over their land acquisition. They took also subject to the servitude their own claim of title would have revealed by an ordinary diligence. That the deed of relinquishment of right-of-way was not filed with the Recorder of Deeds of Morgan County was an error under the Chapter 228 procedure for the establishment of a public road which did not affect Supreme Express and Transfer or Bussmann who had notice otherwise and so do not stand to complain. *Summers v. Cordell*, 187 S.W. 5, 8[4] (Mo.1916).

■ The defendants contend also that if the Upper Road was ever a public way it lost that character and became a private road by virtue of recitals in the deed from Deem to Supreme Express which confined travel on the Upper Road to a restricted class. The defendants derive this premise

from the references in the conveyance to the Upper Road, not as such, but by legal description, as "a private road"—and also, from the provision of deed that the grantee keep the "private road" in present location to provide free right-of-way and use to the "occupants of the south side of that road." It must be noticed, of course, that the deed designation of the Upper Road as "a private road" contradicts the deed designation which subjects the grant of right-of-way for a county road with the attendant "rights and easements of ingress and egress." As we hold, and explain more amply, the strip of land over the Point property described in the conveyance from Deem to Supreme Express as "a private road" coincides with the "Right of Way to County for County Road" intended by the deed description and then actually perfected. At the time of the conveyance, neither Deem nor Supreme Express understood that the "Right of Way to County for County Road" [in 1923] duly recorded had not been officially opened as a county road. Rather, the successive grantors and grantees assumed that the continuous public use over the Upper Road was by authority of a grant of right-of-way adopted by the county court.

The contention fails for more fundamental reason. A road once installed as a public way, the right of the public to use it becomes vested and, absent vacation or abandonment [§ 228.190], cannot be divested thereafter. *Liberty Township of Stoddard County v. Telford*, 358 S.W.2d 842, 844[4] (Mo.1962); *State ex rel. Carter County v. Lewis*, 294 S.W.2d 954, 958[4] (Mo.App. 1956). Nor can a public use be ousted by the private concurrence of a grantor and grantee of the servient land. That is only to say that the public, alone, which has the right to the use of the public way, can surrender or abandon that right. *Oetting v. Pollock*, 189 Mo.App. 263, 175 S.W. 222, 224 (1915). The burden to prove an abandonment or vacation rests on the party who asserts that proposition. *Rosendahl v. Buecker*, 27 S.W.2d 471, 472[4, 5] (Mo.App. 1930). The evidence was altogether conclusive of an open and public use of the Upper Road continuously from year 1933, when that way was legally established as public road by the county court until year 1975, when defendant Bussmann threatened interruption by the installation of the posts and gate across that highway.

The order of the county court on December 31, 1932, to establish a public road on the right-of-way conveyed to Morgan County by Peter Milton Cooper and wife on November 11, 1931, was given prompt effect by the installation of the Upper Road.[5] The road work was done by employees of the Morgan County Court, among them Peter F. Cooper [kinsman of the original Cooper] and Herman Nolting [later County Court Judge], lifelong residents around the Point. The work commenced at the end of year 1932 and continued for about two years.[6] The road, thirty feet wide, was constructed to the edge of the water and, at that terminus, a turn-around was installed so that vehicles could reverse and exit by the same course they had come. The road was thereafter maintained by the Morgan County Court and was open and used continuously by the public for access to the waterfront. Herman Nolting served as County Judge for Morgan County from 1935 through 1939, was defeated for reelection, and then returned for intermittent service until year 1971. Morgan County maintained the Upper Road as a county way during his tenure from 1935 through 1939. He served again from 1941 through

5. It aids understanding that Cooper was sole owner of the entire Point headland both at the time of the abortive conveyance in 1923 of the forty-foot-wide strip of land "across [his] farm" and of the effective conveyance for right-of-way in 1931, of a thirty-foot-wide strip of land platted as "the C. H. Sidebottom Public Road in the County Clerk's Office in the Court House in Morgan County."

6. The testimony by Nolting and the other witnesses is uncertain as to the exact date of installation and completion of the County Road, but the dates we use are the most congruent with the documentary evidence.

1951 during which time the Upper Road was maintained. Then, during another term in that office, one Frederick was paid by the county to maintain the Upper Road. [The testimony by Frederick was that he was employed by the county to operate his grader over the Upper Road from 1955 to 1963. He worked the road all the way to the lakefront every Spring and every Fall and otherwise, as needed. Throughout this period the Upper Road was open and used continuously by the public as an access to the water.]

The testimony of Peter F. Cooper, another lifelong resident around the Point, also described his work on the installation of the Upper Road as a public way under the order of the county court. He later delivered mail along that road from 1947 into 1963. His memory was that both the predecessor road—before creation of the Lake of the Ozarks—and the successor Upper Road were always public ways openly and continuously used by himself and the public for access to the water, without restriction or obstruction. The Upper Road remains in the same location as at the time of installation.

The plaintiffs Osburn became familiar with the Point in year 1948, and at that time the Upper Road was in place all the way to the water. The entire promontory crossed by the Upper Road was then owned by the elder Cooper. They purchased a lot on the Point in 1949, elevated one-hundred feet above the Lake and the Upper Road was the only practicable means of descent and access to the waterfront and their boat dock. The Osburns and the other plaintiffs with contiguous lots and the public used the road freely without challenge or obstruction

from Cooper. Their use was altogether untrammeled until the defendant Bussmann installed metal posts and gate across the Upper Road in year 1975—albeit Bussmann did not close and fasten the barrier. The plaintiffs Spencer purchased a tract on the Point in year 1968. He and his wife became familiar with the locale in 1951, when he leased a cabin from Deem [who conveyed a separate tract to the plaintiffs Osburn]. The Upper Road was then in place as was the lakefront area. They and other property owners made continuous and unobstructed use of the Upper Road as did other persons, vehicles and animals. There was never any threat to deny access over the Upper Road until the gate was installed, although never closed, in year 1975. [The testimony of the other plaintiffs was received on the stipulation that it would be "in all respects to the same effect" as that given by plaintiffs Osburn and Spencer.]

All the witnesses, *for both the plaintiffs and defendants,* who had been on the Point land from construction of the Upper Road as a county way until installation of the gate, without exception, testified that the Upper Road was used by the public as well as by the property owners for access to the lakefront.[7] Thus, witnesses Sevorens, Dalton and Lucker, both owners and nonowners of property on the Point used, and saw used by the public, unobstructed passage over Upper Road to the Lake over periods which encompassed from 1943 through 1976. Even defendant witness Hayes, a county employee for thirty years, testified that from 1943, when he commenced to grade roads for Morgan County, the Upper Road had been an open public road.[8]

---

7. One witness, Odam, who leased a cabin on the Point in 1935 from Peter Milton Cooper, thereafter owned property there and continued to use the Upper Road for access to the Lake through 1959, even after he sold that site was denied passage on the Upper Road to the water by the defendant Gresham, caretaker for defendants Supreme Express-Bussmann. That incident, in about 1975, was the first time his [or any other reported] use of the Upper Road was ever challenged. The defendant Bussmann, we note, does not contend that the Upper Road was not used by the public, but that

as to them, that use was trespass. Nor does he contend the plaintiffs and other Point landowners do not have the right of access over the road to the lakefront, but only that, as to them, that access is permissive through year 1981, by virtue of the Supreme Express deed from Deem, and not as a passage over a public road.

8. Our affirmance of judgment on Count I rests on the determination that, as a matter of law, the Upper Road was established as a public roadway by the formal order of the County Court of Morgan County in culmination of the

The evidence does not allow inference, or even issue, that the Upper Road was vacated or abandoned as a public way by public nonuser for five years continuously. The deed from Deem to Supreme Express had no power to metamorphose the Upper Road from a public into a private way by mere declaration. The public character of the Upper Road remains unchanged.

There remains the question of the width of the Upper Road. The judgment locates the roadway across a strip of land twenty feet wide, ten feet on each side of the described centerline. Section 229.010 provides that "[a]ll public roads in this state which hereafter may be established shall not be less than thirty feet in width." There is authority that creation of a public road under § 228.190, by continuous public use for ten years and upon which public money or labor was expended for that period, may be valid although the width created was only eighteen to twenty feet. *Drydale v. Kiser*, 413 S.W.2d 506, 508[3, 4] (Mo.1967). We conclude, however, that the Upper Road

was constituted as a public road by an official order of the county court unaided by the public use and expenditure which generates such a highway under § 228.190.[9] That roadway installed by the order of the county court was on a conveyance by Cooper of right-of-way over a described course *thirty feet wide*, conformable to the requirement of statute.

A survey of the Upper Road and Lower Road was attempted by Slagle, current Surveyor for Morgan County, as trial preparation for the plaintiffs. He was prevented access to the premises for that purpose by caretaker Gresham on the instruction of defendant Bussmann. [It happens that Slagle had made a private survey of the Point property for Bussmann, whether before or after conveyance from Deem and therefore additional notice to Bussmann of the location of these defined roads, does not appear.] Slagle ultimately delineated the center line of the public road established by the county court order of December 31, 1932[10] and locations of the Upper Road and Lower

procedures under Chapter 228, unaffected by the requirement of § 228.090 to record the conveyance of right-of-way, because the defendants, otherwise with notice, have no cause to complain. The contention of the defendants that the failure to record the right-of-way conveyance of 1931 was such an irregularity as to be cured only by compliance with § 228.190 by evidence of "use [as a public highway] by the public for ten years continuously, and upon which there shall have been expended public money or labor for such period"—a proof not shown by the evidence—in any event is dispelled by the witnesses. Proof under that statute does not mean a constant expenditure of public money or labor for " 'each and every year for such 10-year period'; but it is sufficient to show that the expenditure of public money or labor began and 'continued from time to time for the period of limitation as [reasonably] might be considered necessary or expedient by those in authority' and that such expenditure was sufficient to maintain the road 'in substantial repair and condition for * * * public travel.' " *Dayton Township of Cass County v. Brown*, 445 S.W.2d 322, 324 (Mo. 1969); *State ex rel. Carter County v. Lewis*, supra, l. c. 957; *Liberty Township of Stoddard County v. Telford*, supra, l. c. 842. The public use was continuous from installation in about 1933 to at least 1975. The expenditure of funds and labor by Morgan County on the Upper Road was, according to Judge Nolting, from

1935 through 1939 and from 1955 to 1963 by payment to Frederick. Witness Hayes for the defendants testified that he worked the entire course of the Upper Road for the county from 1943 into 1946. On the principles of *Dayton Township, Carter County* and *Liberty Township*, supra, any irregularity in the county court proceeding to establish the Upper Road as a lawful public way, from failure to record the conveyance of right-of-way was cured by the continuous use of the road as a public highway and the expenditure of funds and labor to maintain the way for the ten-year period 1935 through 1946 [testimony of Nolting and Hayes] or the ten-year period from 1946 through 1955 [testimony of Hayes and Frederick].

9. The judgment of Count I for a public roadway twenty feet wide gives color to the possibility that the adjudication was mistakenly formulated under the procedure and proof of § 228.190.

10. The certified copy of order to establish the public road by the County Court of Morgan County shows the date November 3, 1931, but the county clerk treats the instrument as dated December 31, 1932,—perhaps from a marking of that date on the reverse side of the record. In any event, the petition for the location of the public road was filed in October, 1931, and the Cooper conveyance of right-of-way was dated November 19, 1931.

Road in place. The centerline of the county road was recapitulated from the county clerk records in the formal proceeding in 1931 to open a county road by petition under Chapter 228. He derived the centerline of the county road from the original survey by then County Engineer Stevenson made at the order of the county court. Slagle determined that the Upper Road followed generally the line of the county road as established by survey from the Lake of the Ozarks to the quarter section corner to the east. The course of the actual Lower Road was also depicted as well as an adjacent dock area, about 275 feet in width, the subject of the Count II adjudication. The complete rendition of the Slagle survey was received in evidence and appears here as Appendix.

■ The county road was installed to a width of thirty feet, as ordered by the county court, and commensurate with the easement conveyed to the county by the Cooper deed of right-of-way. The evidence was that the location of the Upper Road coincides with the county road as originally installed. The surveyor Slagle found, however, that the travelled portion of the Upper Road was twenty feet in width, and the court adjudicated that dimension as the width of the Upper Road as an established public way. That element of adjudication was erroneous. The Upper Road became a public road by the proceedings under Chapter 228 and once legally established, the public right to use the entire surface of the easement became vested and could not be divested thereafter, absent vacation or abandonment. *Liberty Township of Stoddard County v. Telford*, supra, l. c. 844. The failure to use the entire width of a county road does not constitute abandonment of any portion of the way. *Webb v. City of East Prairie*, 359 Mo. 247, 221 S.W.2d 153, 154[1] (1949); *Baughman v. Faulwell*, 156 Mo.App. 227, 137 S.W. 627, 628 (1911). That the surveyor returned a report of a new road forty feet wide, rather than the thirty feet ordered by the county court between the described points, does not affect the validity of the order. The county court alone, had authority to determine the width of a public way formally established by petition under §§ 228.010 through 228.-100. *Hall v. Flag Special Road Dist.*, 296 S.W. 164, 166[5] (Mo.App.1927); § 228.100.

The Upper Road was lawfully established as a public road thirty feet wide on a route with definite beginning, course and terminus by petition and notice to the landowners affected. The order of the county court to locate the public road was then given effect by construction of a course thirty feet wide, and remains in place as the Upper Road. Count I properly found that the Upper Road was a county road from which the defendants were ordered to remove the posts and gates and that the defendants were enjoined from any obstruction on that public way and from interference with the use of that way by the plaintiffs. Count I should have also adjudicated properly that the Upper Road was *thirty feet* wide along the described course.

The judgment on Count I is affirmed but remanded for that correction.

## COUNT II: THE LOWER ROAD AND THE DOCK AREA

The plaintiffs in Count II claimed the right of easement by prescription of travel over the Lower Road and over a strip of waterfront for Lake access and also that defendants ought to be restrained from interference with that use and be required to remove the posts and gates installed by them across that roadway. The defendants answered that the use by plaintiffs over the Lower Road and the waterfront area was by their permission and under a license reserved to the defendants in the grant of the property to them by Deem, duly recorded.

■ The court found against the plaintiffs on Count II without a statement of grounds but with the parenthesis that the judgment did not undertake to determine the legal effect, if any, of the recitations in the deed of grant from Deem to Supreme Express on the claim of the plaintiffs to the prescriptive use of the Lower Road and dock area.

The provision of deed which the Count II judgment evades is contained in the conveyance of February 1, 1962, from Deem to Supreme Express [Bussmann]:

There shall further be reserved free right of ingress and egress over a route to be selected by party of the second part [Supreme Express], its successors or assigns, to a point on the Cove to be selected by party of the second part, which point may be used without charge by each owner of, or party having leasehold interest in, the property on the South side of said private road, for erection and maintenance of a floating dock or landing point, said right to extend for a period of twenty (20) years from December 31, 1961.

The evidence shows conclusively that, as to the western length of the Lower Road and the dock area which it serves [see Appendix], a prescriptive easement inured to the plaintiffs and their successors, so that any passage which the later deed from Deem to Bussmann may otherwise import in favor of contiguous landholders becomes irrelevant to prove that the use was permissive at inception.[11] The evidence shows also, that as to length of the Lower Road to the east, the proof of prescriptive use was also established. Count II, however, is remanded for other reasons.

The Lower Road runs from the western terminus of the Upper Road at the waterfront along the northern bounds of the Supreme Express property along a cove inlet and then to the east conjoins once again the Upper Road at a north and south county road. All the evidence agrees that a route along the Lower Road was in being at least by year 1943, and was used as access to the cove area by the public. The evidence is as certain that the portion of the Lower Road which faces onto the cove inlet was installed by the county work force [apparently under private auspices] in year 1932 at the same time the Upper Road was constructed by order of the county court. A turnaround was installed as part of the private

---

11. The deed from Deem to Supreme Express with "reservation" of passage in favor of property holders not in privy to the transaction, for a number of reasons, was without effect as a conveyance of interest in that land and, a fortiori, to prove a permissive use of the land by them. First, on the basic principle that a transfer of interest in realty requires words of grant, a grantor cannot create an interest by way of reservation in a third party stranger to the instrument. Thus, the "reservation" attempted by Deem in the deed to Supreme Express in favor of the contiguous landholders [plaintiffs] for ingress and egress to the Cove was inoperative as a grant of interest to the realty—unless to confirm a right already existent in those third parties. 6 Thompson on Real Property § 3091 (1962 Repl.); *Williams v. Diederich*, 359 Mo. 683, 223 S.W.2d 402, 403[1] (1949). At best the "reservation" of "free right of ingress and egress over a route to be selected by [Supreme Express] to a point on the Cove . . . [to be] used without charge by each owner . . . the property on the South side of said private road" creates a license in favor of the property holders on the south side of the road [marked on Appendix survey as the "20" Easement Road—and mentioned in the deed reservation as the "private road"] which separates the Supreme Express property and plaintiffs' tracts. Such a license does not run with the land but expires with the alienation of the land or death of the grantee. *Gwinn v. Gwinn*, 77 W.Va. 281, 87 S.E. 371, 372[1] (1915). Second, the "reservation" cannot claim the efficacy of even a license because the deed does not say with sufficient certainty what the grantor Deem intended to except from the operation of the conveyance and the means to identify the land under license are not otherwise evident in the terms of conveyance. 6 Thompson on Real Property § 3092 (1962 Repl.). The recital for right of passage over the Supreme Express land to the water "over a route to be selected" by the grantee becomes all the more vague by failure of the grantee to select a route altogether. Particularly, there is no intimation that the passage, wherever intended, was either the Upper Road or the Lower Road. Finally, whatever validity the "reservation" may have even as a license does not prove a permissive use against the third party licencees without notice. The deed from Deem to Supreme Express was a muniment outside the chain of title of the plaintiffs and so, although duly recorded, was without effect to notify them of the "reservation" and other recitals in that conveyance. *Gross v. Watts*, 206 Mo. 373, 104 S.W. 30, 36[5] (1907); *Garrett v. Wiltse*, 252 Mo. 699, 161 S.W. 694, 698[10] (1913). The trial court should have adjudged accordingly. That failure, however, is irrelevant to decision because all the evidence shows that the right of plaintiffs to the Lower Road, to the extent proved, derives from an adverse user commenced long before the year 1962 conveyance from Deem to Supreme Express.

Lower Road construction [mark "D" on the Appendix] to enable vehicles to the cove to exit as they had come. The contour of the Lower Road lies very flat at the western segment but once past the cove, the road climbs steeply uphill to the east. The county surveyor Slagle, for the plaintiffs, measured the travelled surface of the Lower Road and of the turn-around to be twenty feet wide.

The evidence is clear that this segment of the Lower Road which skirts the cove and faces the dock area was in continuous public use since installation in year 1933. It is undisputed that the plaintiffs and their predecessors in title used the Lower Road segment opposite the dock area continuously, openly and without obstruction from the date of the conveyances to them of their tracts on the hill. Nor is there doubt that the plaintiffs used the cove area for their boats and other water sport without threat until the defendant Bussmann raised the gates on the Upper Road and Lower Road. The plaintiffs Osburn received their conveyance from Deem in 1949, and the plaintiffs Williams were grantees from Deem almost contemporaneously. They joined to install, first a wooden dock on the cove in 1950, and then in 1962, a replacement steel pier to accommodate two craft. Access to that facility was necessarily from the western segment of the Lower Road upon which it faced and across a strip of shore line. In fact, the defendant Bussmann conceded that from 1956—his first familiarity with the Point—and since, that portion of the Lower Road was used by the plaintiffs and their predecessors in title and others for access to the waterfront.

The evidence allows no doubt that from acquisition of title from Deem in 1949, the plaintiffs Osburn, their guests, other tract owners and the general public used that segment of the Lower Road and dock area openly, continuously and without interruption until the threatened closure of that passage by the Bussmann installation of gates in 1975. The plaintiffs, nor any others, ever sought permission for such use from Cooper, Deem or Supreme Express. To the contrary, the evidence shows only

accession to such user by the fee holders of the Lower Road segment and shoreline. In about 1966 Bussmann requested Osburn and Williams to move their boat pier down the cove to accommodate a dock Bussmann had specially constructed for his own purposes. The plaintiffs acceded, but only after Bussmann agreed to install a series of steps necessary for easy access from the road across the shore to the relocated dock. Nor does the evidence allow doubt that after Supreme Express came into ownership in 1962 Bussmann was aware of the open and continuous user by Osburn and the plaintiffs of that Lower Road segment and the dock area and that he made no gesture—until the 1975 gate installation—to contest their use. Rather, Bussmann affirmed repeatedly that his only intention was to exclude strangers: "[T]he plaintiffs and the people who lived at the top of the hill and their friends could cross the property [to the boat docks]."

The defendant Bussmann explains his acquiescence as merely an extension of the permission to the cove reserved until December 31, 1981, to contiguous landholders in the deed from Deem to Supreme Express—that such use was permissive, not adverse. That provision of deed [for reasons stated in note 11] was without effect to establish a permissive user by the contiguous landowners over the Supreme Express lands. The testimony and conduct of Bussmann, in any event, belie such a motive. His request to Osburn and Williams to remove their dock was as a suppliant, and not as one who claims by right to designate the "point on the Cove" for placement of the docks which the Deem deed expressly "reserves" to Supreme Express. It was only after Bussmann agreed to duplicate a stairway that the plaintiffs allowed their dock to be moved. Also, in his own idiom, it was only on account of "the complaints I heard, Mr. Osburn chewed my caretaker out"—that Bussmann never attempted to close the gates across the roads. Nor did Bussmann ever assert to any plaintiff that their use was tolerated and permissive only, by the terms of the deed "reservation" or other

auspice. To the contrary, the evidence was stipulated that the plaintiffs had no actual notice of that content of deed.[12]

■ The efficacy of the deed "reservation" as a permit to use the Lower Road and cove area aside, the evidence shows without dispute that the plaintiffs Osburn had perfected an easement by a prescriptive adverse user of that segment of the Lower Road and the shore and dock area which adjoins long before the conveyance with "permissive" provision of deed from Deem to Supreme Express in 1962. The grant by Deem to the Osburns was in 1949. From that date, the Osburns used those areas openly, continuously, without interruption and adversely until 1962 and thereafter. No evidence disputes that inference. "An easement by prescription to use a roadway across the lands of another may be established by use which has been shown to have been continuous, uninterrupted, visible, and adverse for a period of ten years." *McDougall v. Castelli*, 501 S.W.2d 855, 858[3–5] (Mo.App.1973). A *continuous* use within this principle encompasses "travel . . . at such times by the users as their convenience and business needs require . . ." *Moravek v. Ocsody*, 456 S.W.2d 619, 625[3] (Mo.App.1970). That element of an easement by prescription, as well as an open use, was proved by uncontradicted evidence. The proof of an uninterrupted use for the prescriptive period was not marred by gates constructed but not closed against the travel [*Brown v. Redfern*, 541 S.W.2d 725, 728[7, 8] (Mo.App.1976)] nor by relocation of the dock by consent of the adverse user for convenience of the landowner [*Moravek v.*

*Ocsody*, supra, l. c. 626]. That the use of the land was adverse as against the owner appears clearly from the refusal by Osburn to recognize in Bussmann any authority to displace, without consent, the dock to another location or to allow the gates to be closed against his usual travel. *Jacobs v. Brewster*, 354 Mo. 729, 190 S.W.2d 894, 897 et seq. [3–11] (1945). This evidence proved an adverse user which became an accrued right of property in the plaintiffs Osburn [as well as in plaintiffs Williams] ten years after 1949, before the defendants acquired title to the servient property, a right to which the defendants submitted. The "reservation" in the Deem deed, whatever the effect otherwise, is irrelevant to the claim of prescriptive right by the Osburns and Williams.

■ The evidence as to the plaintiffs Spencer was that they received conveyance in year 1968, but that their predecessors in title, Lucker and Zwisler, had used the Upper Road and Lower Road openly, at pleasure and without permission for access to the lakefront. Lucker testified he had made such use from 1953 and then conveyed to the Spencers. They, in turn, have made a continuous use from 1968 and thereafter. Not only did Lucker not seek permission, he had no knowledge who owned the land over which the roads passed. [The Zwisler-Lucker-Spencer title did not derive through Deem so, the Bussmann assertion as to the effect of "reservation" in the Deem deed to Supreme Express as notice of a permissive user, even on its own terms, has no relevancy to the Spencers.] This evidence of a use, open, continuous, uninterrupted and under

12. In conjunction with request by Bussmann that Osburn and Williams move their dock to allow installation of his own, Mrs. Bussmann delivered to Osburn a transcription of the "reservation" in the deed from Deem to Supreme Express. Osburn responded: "I don't care what Walter Deem or Deem Oil Company put in that deed conveying the property to Supreme. That I had used that road for fourteen years and expected to continue to use it." The plaintiff Williams adopted the same position. The other plaintiffs were not aware of this event. The plaintiffs Osburn and Williams re-

sponded to Bussmann [in the words of Osburn]: "I told him [Bussmann] we wouldn't move it [the dock] an inch until he promised to build steps and I would not ever move it where he had set that stake." Bussmann acceded to this condition. As we have iterated, the claims of Osburn and Williams to the prescriptive use of the dock area and the portion of the Lower Road which adjoined was perfected some years before the Deem conveyance with "reservation" and could not be affected by that provision.

claim of right, too, was uncontradicted. Clearly, use of the Lower Road and waterfront by the Luckers was adverse at inception and remained so by the Spencers. These successive periods of adverse use in privity, which continued unabated at the time of suit, are properly joined to establish the period of prescription. *Auldridge v. Spraggin*, 349 Mo. 858, 163 S.W.2d 1042, 1045[11] (1942). The use of the Upper Road and Lower Road to the waterfront by the owners on the hill were known to the defendants from year 1956 when Bussmann first became familiar with the Point before *purchase* of the property—a use hostile in fact but not contested by the defendants. The right to use the segment of the Lower Road and the opposite lakefront accrued to the Spencers by prescription by year 1964 could not have been divested by the gates installed in year 1975, even closed gates.

 The proof of a use open, notorious, continuous and uninterrupted for the period of prescription raises a presumption that the assertion by plaintiffs to the Lower Road segment and to the shore and dock areas was adverse and under a claim of right. Such a proof casts the burden on the landowner to show that the use was permissive rather than hostile at inception. *Speer v. Carr*, 429 S.W.2d 266, 268[4] (Mo.1968); *Fassold v. Schamburg*, 350 Mo. 464, 166 S.W.2d 571, 572[1, 2] (1942). The contention that the deed from Deem to Supreme Express rendered the use of the roads and shoreline by contiguous landholders permissive, we have concluded, can have no validity as against the Osburns and the Williams whose prescriptive right of easement was perfected before the date of that conveyance, nor as against the Spencers who took from a different grantor, nor as against any plaintiff because the terms of the deed were simply insufficient in law for that purpose. The defendants contend, however, that the use by plaintiffs of their land was otherwise permissive in origin by operation of a tacit custom. The defendants offer the thesis that in circumstances of the cordial relationship between grantor Deem and grantees Osburn and Williams and between Cooper and Lovell, predecessor in title to Spencer, the use of the roads and shoreline by these plaintiffs was merely a beneficence of an accustomed Ozark bonhomie rather than a hostile defiance of landowner authority. The contention remains hypothetical, however. Deem was not called to testify nor does any evidence at hand allow such an inference.

The judgment of the trial court on Count II was against the weight of the evidence to the extent it adjudges against the plaintiffs their claim for a prescriptive easement over the Lower Road segment which faces the dock area and their claim for prescriptive easement over the shoreline which adjoins the Lower Road to the south and the dock area to the north.

There remains to consider the length of the Lower Road from the easement area to the east. The origin of the full Lower Road is obscure. The two county employees who worked to install the Upper Road in 1932 each had a disparate memory of the event. Cooper recalled that the county also constructed the Lower Road at the same time the Upper Road was fashioned. Nolting [later County Judge], the other worker, had no such recollection but testified, rather, that the county work ended with the private extension of the Lower Road and turnaround opposite the dock area. Hayes, another county worker who bladed the Upper Road from 1943 through 1946, testified [for defendants] that he also worked the Lower Road privately. It was his recollection that the Lower Road extended only to the end of the cove but did not go "plumb through at that time." Whatever the true fact, the evidence of the plaintiffs Osburn and Williams shows, for themselves, an adverse use of the Lower Road from end to end from 1949 and thereafter. The evidence of the plaintiffs Spencer shows such an adverse use by Zwisler and Lucker, predecessors in title, from 1953 until 1968 when the Spencers became grantees and by them thereaft-

er. [The remainder plaintiffs, by stipulation, were subject to the same proof and so, under the evidence, made out a prescriptive right over the same areas.] The contentions of the defendants that the user was permissive both by deed "restriction" and by an implicit custom of license of passage over contiguous lands, no more avails as a valid response to the claims of plaintiffs of adverse right, by prescription over the eastern length of the Lower Road than as to the western segment of that road. The evidence by plaintiffs of adverse user over the eastern length of the Lower Road for the prescriptive period did not go without contest as did their adverse user over the western segment and the shore area which adjoins—a use conceded by the defendants [albeit on a premise of license]. Rather, the proof of defendants contended that the Lower Road was neither passable nor used as a passage for much of the period the plaintiffs asserted to constitute the period for an easement by prescription. For that reason, the issue of an easement by prescription over that eastern length of the Lower Road was one for the trier of fact on all the evidence.

The defendants contend also, however, that as to the eastern extension of the Lower Road, whatever right by prescription may have accrued to the plaintiffs was abandoned by them by the time Supreme Express acquired title from Deem in 1962. The defendants contend, in fact, that as early as 1956 when Bussmann first became familiar with the Point [by his testimony] "[t]here was no Lower Road, [or] if there was a road it was so overgrown with weeds, trees and brush" as to require a bulldozer to open the road for use. This he did in 1962 and 1963 when Bussmann engaged one MacMasters to make the improvement so that "the people at the top of the hill [could] come down the Upper Road and go out the Lower Road but they would never go out the Lower Road." Bussmann made it clear that the portion of the Lower Road not open to travel was "the eastern portion of the Lower Road" and not that segment

of the Lower Road which adjoined the docks. In his words: "That has always been there" and continuously used by the tract owners on the hill. The substance of the Bussmann testimony was that from his first familiarity with the area in 1956 until 1962 when he became owner, that segment of the Lower Road east of the dock area was neither used nor usable.

The testimony of the plaintiffs Osburn, Spencer and witnesses Frederick, Lucker, Dalton and Sevorens contradict the contention of abandonment. Osburn used the Lower Road continuously from 1948 as did Williams. Spencer and predecessors used the road continuously from 1953 [when, according to Bussmann, it was unusable and unused] and thereafter. Frederick used the Lower Road many times from 1955 until he left the area in 1963—virtually the identical span Bussmann contends the course was inoperable. The defendant refers to the testimony of Odam that in the early 1950's he came to the cove regularly to deliver boats or fix the docks. He used the Upper Road for access and then across the Lower Road to the docks, but returned by way of the Upper Road because from the boathouse to the east, "[the Lower Road] was pretty bad . . . steep and rough and not used too much." The defendants refer also to the testimony of still another witness called by the plaintiffs, Dalton, who had come to the Point intermittently from 1943 through 1966, that "[later], I don't recall exactly when, that road [the Lower Road] became very rough, and we quit using it. We would turn around and come back the same way we went down." That impassable condition of road, however, refers to the late 1960's, some time after—according to Bussmann—the Lower Road had been improved for use.

These accounts of the road condition and use during the critical period of limitations bear directly on both the contention of plaintiffs of prescriptive right and the contentions of defendants that the right never accrued, but if so, was thereafter aban-

doned. Each presents an issue of fact. The evidence was not only contradictory, but to some extent vague and inconclusive as to the temporal reference so critical to both claim and defense. The evidence allows inference, for instance, that the steepness of the incline of the Lower Road to the east encouraged access to the water from the public Upper Road to the western extension and turn-around of the Lower Road and discouraged egress up the incline of the Lower Road to the east. The evidence also allows inference, however, that the Lower Road from end to end was open and used throughout the prescriptive period, albeit rendered impassable for short periods [according to plaintiff Spencer] by the attrition of heavy rain, but then soon restored. The differences in testimony involve a test of credibility, a prerogative given to the trier of fact.

A use once accrued by prescription may be abandoned and the easement extinguished. *St. Louis-San Francisco R. Co. v. Dillard*, 328 Mo. 1154, 43 S.W.2d 1034, 1038[12] (1931). The matter of abandonment is a question of fact and is proved by an intention to abandon as well as conduct of abandonment. "There must be relinquishment of possession with intent to terminate the easement." *Hennick v. Kansas City Southern Ry. Co.*, 364 Mo. 883, 269 S.W.2d 646, 650[4–6] (1954). Mere nonuser of an easement by prescription for a period short of limitations does not extinguish the easement unless accompanied by an intention to abandon without intention once again to repossess. Only when these unities concur is an abandonment proved—and then only on clear and convincing evidence. *Hatton v. Kansas City C. & S. Ry. Co.*, 253 Mo. 660, 162 S.W. 227, 232[5] (banc 1913); *Hennick v. Kansas City Southern Ry. Co.*, supra, l. c. 269 S.W.2d 650[7].

The evidence on the issue of abandonment coincides with that of adverse user both as to substance and character of contradiction and becomes an issue of fact for the trial court to assess in the first instance.

The evidence on neither issue falls with sufficient decisiveness for a court of review to say as a matter of law whether sufficient or insufficient to prove the fact. Nor do we assume, as to the eastern length of the Lower Road, the facts to be found compatible with the judgment for the defendants on Count II. That for the reason that the adjudication as to the western segment of the Lower Road was erroneous as a matter of law as contrary to the weight of the evidence, and we do not assume that the determination as to the remainder of the Lower Road was not affected by the erroneous judgment which denied easement by prescription over the remainder segment.

The judgment of the trial court on Count II which denies plaintiffs their petition for an easement by prescription over the western segment of the Lower Road and the dock and shoreline areas was against the weight of the evidence and erroneous as a matter of law. *Murphy v. Carron*, 536 S.W.2d 30, 32[1–3] (Mo. banc 1976). We remand Count II to the trial court, however, to determine whether, as a matter of fact, plaintiffs, or any of them, perfected an easement by prescription over the eastern extension of the Lower Road and if so, whether that user of right was abandoned thereafter. We remand Count II also to the trial court for determination of the bounds and character of the private use during the period of prescription. The extent of an easement acquired by prescription is determined by the user by which it is gained and is fixed at the time of acquisition. 2 Thompson on Real Property § 349 (1961 Repl.).

The petition pleads an easement area of two hundred and seventy-five feet of shoreline between the road and the lakefront but the incidences of user by the various plaintiffs, as to the dock placements, swim sports, storage of craft and other water activity do not appear with sufficient clarity for informed determination by a court of review. The evidence concedes that the Lower Road segment actually used for waterfront purposes by the plaintiffs ex-

tends somewhat beyond the turn-around on the Lower Road and sufficiently eastward to accommodate access to the boat docks used by plaintiffs. The precise eastern bound is a matter of fact for the trial court. There was disputed proof, however, that a launch of water craft was possible across the shoreline because of the abruptness of the incline. The trial court should properly determine the extent of shoreline the prescriptive user necessarily encompasses for the water activity practiced by the plaintiffs over the period of adverse user and points of access along the shoreline employed by the plaintiffs for those purposes.

The judgment on Count I is remanded for modification and is affirmed as modified. The judgment on Count II is reversed and remanded for proceedings consistent with our instructions.

All concur.

APPENDIX

**LAND SURVEY**

PLAT OF SURVEY MADE FOR G. BROWN SPENCER
AND MORRIS E. OSBURN, ET AL., OF THE OLD
COUNTY ROAD, EXISTING ROADS AND LOCATION
OF BOAT DOCKS ON OR NEAR THE PROPERTY
OF SUPREME EXPRESS AND TRANSFER CO. "
LYING IN THE SOUTH HALF OF THE NORTH-
WEST QUARTER OF SECTION 16, TOWNSHIP
40 NORTH, RANGE 16 WEST, MORGAN COUNTY, MO.
SURVEY MADE SEPTEMBER 12, 1975 AND ON
FEBRUARY 19, 1976.

LEGEND:

A -Defendants' Dock
B -Plaintiffs' Dock
C -Proposed Easement (Designated by broken line)
D -Turn Around
E -Gate & posts to Lower Road
F -Gate & posts to Upper Road
G -Gate to private entrance road to Chateau du Lac
 (E, F, & G as marked and designated by witnesses)
H -Chateau Du Lac
I, J, K, L, M. -Plaintiffs' Tracts
N -Centerline of the County Road opened by court order on
 12/31/32.
O -Private easement road